NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| WINONA M. FLETCHER,<br><br>                Appellant,<br><br>      v.<br><br>STATE OF ALASKA,<br><br>                Appellee. | Court of Appeals No. A-11802<br>Trial Court No. 3AN-11-12161 CI<br><br><br>O P I N I O N<br><br><br>No. 2745 — May 12, 2023 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Philip R. Volland, Judge.

Appearances: Whitney G. Glover (briefing) and Marcelle K. McDannel (oral argument), Assistant Public Advocates, and Chad Holt, Public Advocate, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Wollenberg, Judge, and Suddock, Senior Superior Court Judge.[*]

Judge ALLARD.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Beginning in 2005, the United States Supreme Court decided a series of cases that altered the landscape of juvenile sentencing practices. Grounded in the Eighth Amendment's prohibition on "cruel and unusual punishments," these cases culminated with the Court's declaration in *Miller v. Alabama* that "children are constitutionally different from adults for purposes of sentencing."[1]

In *Miller*, the Court identified three key characteristics that distinguish children from adults.[2] First, children lack maturity and have an underdeveloped sense of responsibility, "leading to recklessness, impulsivity, and heedless risk-taking."[3] Second, children are more vulnerable to pressure from family and peers and "lack the ability to extricate themselves from horrific, crime-producing settings."[4] And third, a child's character is not as well-formed as an adult's, and as a result, a child's actions are "less likely to be 'evidence of irretrievabl[e] deprav[ity].'"[5] The Court held that these distinctive attributes — which are based on common experience as well as science and social science research — "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."[6]

This case requires us to examine the meaning of these declarations as applied to a fourteen-year-old girl who committed three undeniably terrible crimes and

---

[1] *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (discussing predecessor cases, *Roper v. Simmons*, 543 U.S. 551 (2005) and *Graham v. Florida*, 560 U.S. 48 (2010)); *see also Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2021).

[2] *Miller*, 567 U.S. at 471.

[3] *Id.*

[4] *Id.*

[5] *Id.* (alterations in original) (quoting *Roper*, 543 U.S. at 570).

[6] *Id.* at 471-72.

was sentenced to a composite term of 135 years to serve. For the reasons explained in this opinion, we conclude that Article 1, Section 12 of the Alaska Constitution requires a sentencing court to consider a juvenile offender's youth and its attendant characteristics before sentencing a juvenile tried as an adult to the functional equivalent of life without parole. We further conclude that, assuming this new constitutional rule is retroactive, the defendant in this case, Winona M. Fletcher, is entitled to a resentencing in which her youth and its attendant characteristics are properly considered.

Accordingly, we reverse the superior court's dismissal of Fletcher's post-conviction relief application and we remand this case to the superior court so that the parties may further litigate the question of retroactivity.

*Background facts and prior proceedings*

In 1985, when Fletcher was fourteen years old, she and her nineteen-year-old boyfriend, Cordell Boyd, forced their way into an occupied residence at gunpoint in order to commit an armed robbery. While inside, they killed all three occupants of the home: sixty-nine-year-old Tom Faccio, seventy-year-old Ann Faccio, and Ann Faccio's sister, seventy-five-year-old Emilia Elliot. Fletcher shot Ann Faccio and Emilia Elliot, and Boyd shot Tom Faccio.[7]

*The juvenile waiver hearing*

Following Fletcher's arrest, the State filed a petition to waive juvenile jurisdiction over Fletcher. An extensive waiver hearing was then held in front of Superior Court Judge Karl S. Johnstone to determine whether Fletcher would be tried in

---

[7]   *Fletcher v. State*, 258 P.3d 874, 875 (Alaska App. 2011); *W.M.F. v. State*, 723 P.2d 1298, 1299 (Alaska App. 1986).

juvenile or adult court. The critical question before the court was whether Fletcher would be amenable to treatment by the age of twenty. (To waive juvenile jurisdiction, the court had to find that (1) there was probable cause to believe that Fletcher committed the act alleged in the petition, and that the act would constitute a crime if committed by an adult, and (2) Fletcher would not be amenable to treatment by age twenty — the point at which the juvenile system would lose jurisdiction over her.[8] Fletcher did not contest the probable cause finding.)

Five mental health professionals who had evaluated Fletcher testified as to her amenability to treatment within the six-year period. Four out of the five experts expressed pessimism about Fletcher's amenability to treatment within the statutory period, although each expressed the possibility that progress could occur in someone so young. The fifth expert, Dr. Deborah Geeseman, testified that she believed "there is some probability that . . . with intensive and structured treatment [Fletcher] will be amenable to treatment [by the age of twenty]."

Fletcher's mother, Susan Schubert, testified regarding Fletcher's unstable and traumatic upbringing. According to Schubert, Fletcher had experienced sexual, physical, and emotional abuse from the key adults in her life — including Schubert, Schubert's boyfriend, and her maternal grandmother and step-grandfather. Fletcher was also subjected to a chaotic living environment marked by frequent moves, alcoholism, and illegal drug use.

Schubert testified that Boyd became sexually involved with Fletcher when Fletcher was thirteen years old.[9] Schubert was evicted from her residence shortly after

---

[8]   *W.M.F.*, 723 P.2d at 1302; former AS 47.10.060(d) (1985).

[9]   We note that it was criminal for Boyd to engage in sexual penetration or contact with Fletcher given their age difference. *See* former AS 11.41.436(a)(1), .438(a) (1985).

Fletcher's fourteenth birthday, leaving Fletcher with no way to locate her. Around this same time, Fletcher began prostituting herself in downtown Anchorage.

Schubert testified that Fletcher told her that it was Boyd's idea to shoot the victims. A counselor from McLaughlin Youth Center, where Fletcher was detained, similarly testified that Fletcher told her that Boyd "was the one person that truly cared about her and loved her" and that she "did what he told her to do."

However, Boyd testified against Fletcher at the juvenile waiver hearing, painting a different picture. By that time, Boyd had reached a plea agreement with the State. The plea agreement reduced his charges to two counts of second-degree murder and one count of first-degree murder. As part of that plea agreement, Boyd was required to testify at Fletcher's waiver hearing, at any trial, and at sentencing.

At the juvenile waiver hearing, Boyd stated that Fletcher showed little reluctance to participate in the crimes. According to Boyd, it was Fletcher's idea to shoot the victims. Based on Boyd's testimony, the superior court found that Fletcher "was not forced, coerced, induced, or under influence by Boyd when she shot Ann Faccio and Emilia Elliott."

Ultimately, the court found that Fletcher would not be amenable to treatment before the age of twenty, and she could therefore be prosecuted as an adult. Soon afterward, a grand jury indicted Fletcher on three counts of first-degree murder.

*The sentencing hearing*

One month after this Court affirmed the superior court's juvenile waiver decision,[10] Fletcher, then fifteen years old, entered a no contest plea to two counts of first-degree murder and one count of second-degree murder. Fletcher faced a sentencing

---

[10] *W.M.F.*, 723 P.2d at 1305.

range of 20 to 99 years for each count of first-degree murder and a range of 5 to 99 years for the count of second-degree murder.[11]

The sentencing hearing was held before a different judge, Superior Court Judge Victor D. Carlson. At the hearing, the prosecutor argued that the court should impose the maximum sentence and that Fletcher "should never see the light of day" again. The prosecutor stated that she "[could not] explain how someone by the age of fourteen becomes as evil as Winona Fletcher was but that's just the way she is." The prosecutor also argued that the court should not give any weight to Fletcher's age and should treat her as an adult:

> She has to be treated like an adult, she's been waived to adult court, she's got to be treated the same way as Mr. Boyd and she's got to be viewed as an adult committing this crime. The fact that she was fourteen at the time does not merit a lesser punishment. Our society in general does not view it as necessarily a mitigating factor that she is younger.

The prosecutor stated that "[t]here [were] no Court of Appeals decisions that [said] once a juvenile is waived that the court somehow . . . should treat them more leniently than an adult murderer in the same situation."

Fletcher's attorney noted that Judge Johnstone had only decided that Fletcher could not be rehabilitated in six years — not that she could *never* be rehabilitated. Fletcher's attorney asked the court to give Fletcher "a chance to show someone somewhere down the road that she has changed" by making her eligible for parole when she was forty or fifty years old.

The court's sentencing remarks were fairly cursory. The court acknowledged that, according to an updated evaluation from one of the experts, Fletcher

---

[11] Former AS 12.55.125(a) & (b) (1985).

had made some progress since the waiver hearing. But the court noted that the expert could offer no explanation for Fletcher's conduct. The judge then stated:

> And that's what leaves me with the finding that your rehabilitation is very, very unlikely because I don't know what it is that you would be rehabilitated over or for or from or to what you would be rehabilitated. Because of your essential lack of a criminal record I had to look at that very carefully because rehabilitation is a very important factor in anyone who is young and especially in someone as young as you. But I essentially can't find evidence that you would become rehabilitated because I don't know what is wrong today.

In accordance with these remarks, the court prioritized the other *Chaney* factors — reaffirmation of societal norms, protection of the public, and deterrence of others — over rehabilitation.[12]

The court originally stated that it was sentencing Fletcher to consecutive terms of 99 years of imprisonment for each count. But the court later modified Fletcher's sentence to three consecutive 45-year terms — for a composite sentence of 135 years — to conform to the court's intent that Fletcher be eligible for discretionary parole at age sixty. According to the court, it was "important for prison administration that there be some glimmer of hope and people at age sixty are always different than they are at age sixteen and so forth."

*Fletcher's first post-conviction relief application*

Two days after Fletcher was sentenced, the *Anchorage Daily News* reported that, in a jailhouse interview, Boyd had recanted his testimony from the waiver hearing

---

[12] See *State v. Chaney*, 77 P.2d 441, 444 (Alaska 1970), *as codified in* AS 12.55.005.

in which he said that the killings were Fletcher's idea. Boyd now claimed that he had directed Fletcher to kill both women.

Several months later, Boyd told Fletcher's attorney that he had lied during his testimony at the waiver hearing, that he was the person primarily responsible for the murders, and that he had told Fletcher what to do. Fletcher's attorney took no contemporaneous action in Fletcher's case based on this new information.

Approximately two decades later, in 2005, the United States Supreme Court decided *Roper v. Simmons*.[13] In *Roper*, the Supreme Court held that the cruel and unusual punishment clause of the Eighth Amendment prohibits the imposition of the death penalty on juveniles (*i.e.*, those defendants who were under eighteen years old at the time they committed their crimes).[14] In reaching this conclusion, the Court relied on scientific research regarding childhood brain development that showed that the areas of the brain involved in behavior control continued to mature through late adolescence. Based in part on this research, the Court identified three distinct differences between juveniles and adults: (1) juveniles exhibit a "lack of maturity and an underdeveloped sense of responsibility"; (2) juveniles are "more vulnerable or susceptible to negative influences and . . . peer pressure"; and (3) a juvenile's character is "not as well formed as that of an adult" and their personality traits "are more transitory."[15] After surveying state legislation and court decisions, the Court concluded that a national consensus against the juvenile death penalty had developed, and that this national consensus reflected "the evolving standards of decency that mark the progress of a maturing

---

[13] *Roper v. Simmons*, 543 U.S. 551 (2005).

[14] *Id.* at 578.

[15] *Id.* at 569-70 (citations omitted).

society."[16]  Given this national consensus, and given the demonstrated diminished culpability of juveniles and their capacity for change, the Court held that the imposition of the death penalty on juvenile offenders under eighteen years old was prohibited by the Eighth Amendment.[17]

Following the Supreme Court's decision in *Roper*, Fletcher filed a post-conviction relief application, alleging that the new developments in juvenile brain research, together with Boyd's recantation, had altered the opinions of the mental health professionals who previously evaluated her.  Fletcher argued that this new evidence would have caused the court to deny the State's motion to waive juvenile jurisdiction, which would have deprived the superior court of jurisdiction to enter her convictions. (Fletcher's first post-conviction relief attorney only attacked the waiver hearing; she did not directly challenge the sentence Fletcher received in adult court.)

In support of her petition, Fletcher's attorney offered updated opinions from three of the psychologists who had evaluated Fletcher prior to the juvenile waiver hearing.  Each indicated, in light of the new evidence and contrary to their earlier opinions, that they would have found Fletcher's amenability to treatment within the statutorily prescribed period to be a least somewhat more likely than they previously had opined.

One of the psychologists provided a substantially more favorable view, stating that "had the new juvenile brain development research, as well as Mr. Boyd's new statement, been available to me at the time I evaluated [Fletcher], this data would have affected my findings, inferences based on those findings, and ultimate opinion."

---

[16]  *Id.* at 561, 564-67 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion)).

[17]  *Id.* at 578.

The doctor further indicated that he "would almost certainly have concluded that Winona Fletcher could be (or could have been) rehabilitated by her 21st birthday."

The superior court dismissed Fletcher's first post-conviction relief application on the pleadings, ruling *inter alia* that Fletcher had waived any defects in the juvenile waiver proceeding by pleading no contest to the adult criminal charges. This Court affirmed that procedural ruling.[18] Because the dismissal was procedural, the new psychological reports were never considered on their merits.

During the pendency of Fletcher's appeal from the denial of her first post-conviction relief application, the United States Supreme Court decided *Graham v. Florida*.[19] In *Graham*, the Court held that the Eighth Amendment categorically bars a sentence of life without the possibility of parole for juveniles convicted of nonhomicide offenses.[20] The Court noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" such that juveniles are "less deserving of the most severe punishments."[21] Looking both to community consensus and to its own independent judgment, the Court held that sentences of life imprisonment without the possibility of parole for juveniles convicted of nonhomicide offenses did not serve legitimate penological goals.[22] The Court therefore held that, while a state is "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," the state must afford "some

---

[18] *Fletcher v. State*, 258 P.3d 874 (Alaska App. 2011).

[19] *Graham v. Florida*, 560 U.S. 48 (2010).

[20] *Id.* at 74, 82.

[21] *Id.* at 68-69 (citing *Roper*, 543 U.S. at 569).

[22] *Id.* at 74.

meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[23]

*Fletcher's second (and current) post-conviction relief application*

Following *Graham*, Fletcher filed a second application for post-conviction relief. This second post-conviction relief application is the subject of this appeal. Relying on the Supreme Court's decision in *Graham*, Fletcher argued that her sentence constituted cruel and unusual punishment under the federal and state constitutions because it did not provide a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[24]

The State filed a motion to dismiss, arguing that Fletcher's second application for post-conviction relief was time-barred, procedurally barred (because the issues could have been raised in her prior application for post-conviction relief), and successive.

Before taking action on the State's motion to dismiss, the court stayed further proceedings pending a decision by the United States Supreme Court in *Miller v. Alabama*, a third case regarding juvenile sentencing.[25]

In *Miller*, the Supreme Court extended the reasoning underlying *Graham* to juveniles who have been convicted of homicide crimes, noting that nothing about the characteristics of juveniles relied on in *Graham* was "crime-specific."[26] The Court therefore concluded that "the Eighth Amendment forbids a sentencing scheme that

---

[23] *Id.* at 75.

[24] *Id.*

[25] *Miller v. Alabama*, 567 U.S. 460 (2012).

[26] *Id.* at 473.

mandates life in prison without possibility of parole for juvenile offenders."[27]  Although the Court did not foreclose the possibility that a discretionary life without parole sentence could be constitutional, it stated that "occasions for sentencing juveniles to this harshest possible penalty will be uncommon" due to the "great difficulty" in "distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'"[28]  And the Court required sentencers "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[29]

Following the issuance of *Miller*, Fletcher filed an amended post-conviction relief application that developed and set forth Fletcher's constitutional claims with greater specificity.  Fletcher's amended application alleged that her sentence violated the state and federal constitutional prohibitions on cruel and unusual punishment because (1) her 135-year sentence was the functional equivalent of life without parole, and (2) her sentence was imposed without adequate consideration of her youth and the attendant characteristics of youth, as required by *Miller*.

The superior court subsequently dismissed Fletcher's application for post-conviction relief on the pleadings, agreeing with the State that the application was procedurally barred and that Fletcher was not entitled to a resentencing under *Miller*.

---

[27]  *Id.* at 479.

[28]  *Id.* at 479-80 (quoting *Roper v. Simmons*, 543 U.S. 531, 573 (2005) and *Graham*, 560 U.S. at 68).

[29]  *Miller*, 567 U.S. at 480.

*The superior court's ruling dismissing Fletcher's second post-conviction relief application*

The superior court ruled first that Fletcher's application was procedurally barred because it was a successive application.[30] The court acknowledged that there might be a due process exception to the statutory prohibition against successive applications in cases where a new rule of law created a constitutional infirmity in the defendant's sentence. But the court concluded that such a due process exception would not apply in Fletcher's case because Fletcher's constitutional claims failed on their merits.

The court concluded that Fletcher's constitutional claims failed on their merits for a number of reasons: First, the court assumed that *Miller* would not be applied retroactively. (This assumption was incorrect. In 2016, the United States Supreme Court issued *Montgomery v. Louisiana*, in which the Court held that its holding in *Miller* was retroactive.[31]) Second, the superior court ruled that *Miller* only applied to sentences that mandate life without the possibility of parole, and Fletcher did not receive a mandatory life without parole sentence. The court acknowledged that *Miller* had been applied by other courts to discretionary and *de facto* life sentences, but the court ruled that Fletcher did not receive a *de facto* life sentence because she was eligible for discretionary parole at age sixty. Lastly, the court ruled that, even assuming that the precepts of *Miller* applied to Fletcher's case, Fletcher was not entitled to any relief because she had already received a *Miller*-compliant sentencing hearing "where Fletcher's individual characteristics were considered under the *Chaney* factors."

This appeal followed.

---

[30]  AS 12.72.020(a)(6) (providing that a claim for post-conviction relief may not be brought when "a previous application for post-conviction relief has been filed").

[31]  *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016).

*The United States Supreme Court's decision in <u>Montgomery v. Louisiana</u>*

Shortly after Fletcher filed this appeal, the United States Supreme Court issued *Montgomery v. Louisiana*, which settled the question of whether *Miller* was retroactive. In *Montgomery*, the Court held that *Miller* announced a new substantive constitutional rule that applies retroactively to cases on collateral review.[32] The Court also clarified that the rule in *Miller* was about more than simply taking a juvenile's age into account.[33] As the Court explained, "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'"[34] Instead, it is only the "rare" child whose crimes reflect "irreparable corruption" that can constitutionally be sentenced to life without parole.[35]

The *Montgomery* Court also expounded upon the importance of the individualized hearing requirement established in *Miller*:

> A hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.[36]

---

[32] *Id.*

[33] *Id.* at 208.

[34] *Id.* (quoting *Miller*, 567 U.S. at 479).

[35] *Id.* (quoting *Miller*, 567 U.S. at 479-80).

[36] *Id.* at 210 (quoting *Miller*, 567 U.S. at 465).

Although the *Montgomery* Court gave retroactive effect to *Miller*, the Court also explained that this "[did] not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole."[37]

Instead, citing to a Wyoming statute that made all juvenile homicide offenders eligible for parole after 25 years, the Court held that a *Miller* violation may be remedied "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."[38] The Court indicated that it was leaving to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."[39]

*The response to Miller by state legislatures and state courts*

As alluded to in the beginning of this opinion, the *Miller* line of cases has altered the landscape of juvenile sentencing practices across the country.[40] In response to *Miller*, the majority of state jurisdictions have enacted legislative reforms designed to implement the constitutional mandates of *Miller* and the related cases. Various state courts have also issued decisions applying — and, at times, extending — the

---

[37] *Id.* at 212.

[38] *Id.*

[39] *Id.* at 211 (alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

[40] *See, e.g.*, *Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1034 (Conn. 2015) (discussing how the United States Supreme Court's decisions in *Roper*, *Graham*, and *Miller* have "altered the landscape of juvenile sentencing practices"); *State v. Pearson*, 836 N.W.2d 88, 98 (Iowa 2013) (Cady, C.J., concurring) (emphasizing that the court decisions alone do not "express the full scope of the changing landscape of juvenile justice" and noting that "[t]his landscape should be observed by all judges and carefully considered when sentencing juvenile offenders as adults").

constitutional principles underlying *Miller*. Below is a summary of the major legislative and judicial responses to *Miller*.

### *State legislative reforms*

In 2013, less than a year after *Miller* was issued, the Wyoming legislature enacted a statute that eliminated life without parole sentences for juvenile offenders in Wyoming.[41] The Wyoming statute also made the maximum penalty for juvenile offenders convicted of first-degree murder a life sentence with parole eligibility after serving 25 years.[42] (This is the same statute that the United States Supreme Court later referred to approvingly in *Montgomery*.[43]) The following year, the West Virginia legislature passed similar legislation, eliminating life without parole for juvenile offenders and enacting legislation that made all juvenile offenders tried as adults eligible for parole after serving 15 years.[44]

In total, at least fifteen states have enacted legislation that has eliminated life without parole sentences for juvenile offenders and legislation that makes juvenile offenders, including juvenile offenders convicted of first-degree murder and capital offenses, automatically eligible for parole or resentencing after serving a set amount of time.

---

[41] 2013 Wyo. Sess. Laws ch. 18, §1, at 75 (amending Wyo. Stat. §§ 6-2-101(b), 6-2-306(d), (e), 6-10-201(b)(ii), 6-10-301(c), 7-13-402(a)).

[42] *Id.*

[43] *Montgomery*, 577 U.S. at 212.

[44] 2014 W. Va. Acts ch. 37, at 459; W. Va. Code § 61-11-23(b).

Specifically, at least two states (Oregon and West Virginia) make juvenile offenders eligible for parole after they have served 15 years.[45] At least ten states (Arkansas, California, Connecticut, Massachusetts, Nevada, New Mexico, Ohio, Utah, Virginia, and Wyoming) set parole eligibility for juvenile offenders between 20 and 30 years.[46] And at least three states (Colorado, Illinois, and Texas) set parole eligibility for juvenile offenders at 40 years.[47] Notably, no jurisdiction that has fixed a maximum

___

[45] *See* Or. Rev. Stat. § 144.397(1)(a); W. Va. Code § 61-11-23(b). Additionally, in Hawai'i, first and even second-time juvenile offenders may be eligible for parole after as few as 10 years. *See* Haw. Rev. Stat. §§ 706-656(1), 706-606.5, 706-669.

[46] *See* Ark. Code §§ 16-93-621, 5-4-104(b), 5-10-102(c)(2) (parole eligibility after 25 to 30 years depending on nature of the homicide); Cal. Penal Code § 3051(b)(4) (parole eligibility after 25 years); Conn. Gen. Stat. § 54-125a(f)(1) (parole eligibility after 30 years if serving a sentence of more than 50 years); Mass. Gen. Laws ch. 279, § 24 (parole eligibility after 20 to 30 years depending on nature of the homicide); Nev. Rev. Stat. §§ 176.025, 213.12135 (parole eligibility after 20 years if there was only one victim); N.M. Stat. § 31-21-10.2(A) (parole eligibility after 25 years if two or more first-degree murders and 20 years for one first-degree murder); Ohio Rev. Code §§ 2929.03(H), 2967.132 (parole eligibility after 30 years if two or more non-aggravated homicides); Utah Code § 76-3-209(2)(b)-(c) (parole eligibility after 25 years); Va. Code § 53.1-165.1(E) (parole eligibility after 20 years); Wyo. Stat. § 6-10-301 (parole eligibility after 25 years); *see also* Haw. Rev. Stat. §§ 706-656(1), 706-606.5, 706-669 (parole eligibility determined on an individual basis no later than six months after commitment to custody).

We also note that there are nine additional jurisdictions that still allow certain juvenile offenders to be sentenced to life without parole, but these states set parole eligibility for all other juvenile offenders at 35 years or less. *See* Ala. Code § 15-22-28(e)(2)(c) (15 years); Ariz. Rev. Stat. § 13-751(A)(2) (25 to 35 years); Ga. Code § 17-10-6.1 (c)(1) (30 years); Idaho Code § 18-4004 (10 years); N.C. Gen. Stat. § 15A-1340.19A (25 years); Ky. Rev. Stat. § 640.040(1) (25 years); Minn. Stat. § 244.05(4)(b) (30 years); Mont. Code § 46-23-201(4) (30 years); R.I. Gen. Laws § 13-8-13(e) (20 years).

[47] *See* Colo. Rev. Stat. §§ 18-1.3-401(4), 17-34-101(II), (III), 17-34-102(3) (parole eligibility after as few as 23 years under a special program, otherwise after 40 years); 730 Ill. Comp. Stat. 5/5-4.5-115(b), *as amended by* 2022 Ill. Laws P.A. 102-1128 (parole eligibility

(continued...)

parole eligibility for juvenile offenders requires juvenile offenders to serve more than 40 years before becoming eligible for parole.

There are also at least five jurisdictions that have enacted "second look" statutes that allow all juvenile offenders to apply for resentencing after they have served a specific period of time. For example, the District of Columbia allows juvenile offenders to move for resentencing after they serve 15 years.[48] Maryland and North Dakota allow juveniles to apply for resentencing after serving 20 years, while Florida requires juveniles to serve 25 years before being eligible to move for resentencing, and Delaware requires 30 years.[49]

Thus, under the various state legislation, the amount of time that a juvenile convicted of homicide must serve before being eligible for parole or resentencing varies

---

[47] (...continued)
after 20 years for first-degree murder or after 40 years if additional aggravators create natural life sentence); Tex. Gov't Code § 508.145 (parole eligibility after 40 years).

[48] *See* D.C. Code § 24-403.03 (allowing defendants who were under twenty-five years old at the time of their criminal conduct to move for resentencing after serving 15 years). The District of Columbia initially allowed for defendants who were under eighteen years old at the time of their criminal conduct to move for resentencing after 20 years. 2016 D.C. Law 21-238 § 306(b). It then changed the amount of time to serve before resentencing to 15 years. 2018 D.C. Law 22-313 § 16(b). Most recently, it changed who was eligible for resentencing from defendants who were under eighteen at the time of their criminal conduct to defendants who were under twenty-five at the time of their criminal conduct. 2020 D.C. Law 23-274 § 601.

[49] *See* Md. Code, Crim. Proc. § 8-110 (allowing juvenile offenders to move for reduction in sentence after serving 20 years); N.D. Cent. Code § 12.1-32-13.1 (same); Fla. Stat. § 921.1402 (allowing juvenile offenders convicted of murder to apply for resentencing after serving 25 years); Del. Code § 4204A(d) (allowing juvenile offenders convicted of first-degree murder to petition a court for resentencing after serving 30 years); *see also* Mo. Stat. § 558.047 (allowing juvenile offenders to petition for sentence review after serving 25 years).

from a low of 15 years to a high of 40 years, with the majority of these jurisdictions setting parole (or resentencing) eligibility between 20 and 30 years.[50]

In addition to creating *Miller* "fix" and "second look" statutes, many jurisdictions have also amended their criminal statutes to require sentencing courts to affirmatively consider how children are fundamentally different than adults for purposes of criminal sentencing. These legislative amendments have typically set out a non-exhaustive list of "mitigating circumstances" based on the *Miller* factors that sentencing courts must consider when sentencing a juvenile offender tried as an adult.[51]

---

[50] *See also State v. Booker*, 656 S.W.3d 49, 61-63 (Tenn. 2022) (summarizing sentencing and parole statutes in other jurisdictions and concluding that thirty-six or nearly three-fourths of other states allow for juvenile offenders to receive a sentence with the possibility of release in less than 35 years); *Jones v. Mississippi*, 141 S. Ct. 1307, 1336 (2021) (Sotomayor, J., dissenting) (explaining that the legislatures of twenty states and the District of Columbia had changed their policies to prohibit life without parole sentences for all juvenile offenders).

[51] *See, e.g.*, Fla. Stat. § 921.1401(2) (setting out a non-exhaustive list of factors for a court to consider when imposing a life sentence on a person who was under eighteen years of age at the time of the offense); 730 Ill. Comp. Stat. § 5/5-4.5-105(a) (requiring a sentencing judge to consider various factors before sentencing a juvenile); Iowa Code § 902.1(2)(b)(2) (listing circumstances a court should consider when determining what sentence to impose on a defendant convicted of first-degree murder committed when the defendant was under eighteen years old); Mo. Rev. Stat. § 565.033(2) (setting out factors for a court to consider in assessing punishment in a first-degree murder case in which the defendant was under eighteen years old at the time of the offense); Neb. Rev. Stat. § 28-105.02(2) (setting out a non-exhaustive list of six "mitigating factors" for a court to consider when sentencing a person who was under eighteen years of age at the time of the commission of certain felonies); N.C. Gen. Stat. § 15A-1340.19B(c) (setting out a non-exhaustive list of nine "mitigating circumstances" for a court to consider in a first-degree murder case when sentencing a person who was under eighteen years of age at the time of the commission of the offense); 18 Pa. Stat. § 1102.1(d) (setting out factors on which the court must make findings when sentencing a juvenile for certain homicide offenses); W. Va.

(continued...)

Lastly, some jurisdictions have also modified their parole statutes to ensure that their parole board hearings provide the constitutionally required "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" that *Graham* and *Miller* require. For example, Arkansas has enacted statutes that direct the parole board to take into account how a juvenile offender is different from an adult offender and that require the board to consider a set of youth-related factors.[52] Likewise, West Virginia has enacted a statute that directs the parole board to provide juveniles with a "meaningful opportunity to obtain release" and requires the parole board to consider "the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner during incarceration."[53] Connecticut law similarly requires the parole board to apply special criteria in considering juvenile offender parole eligibility.[54] Oregon law requires the board to "give substantial weight to the fact that a person under 18 years of age is incapable of the same reasoning and impulse control as an adult and the diminished

---

[51] (...continued) Code § 61-11-23(c) (setting out a non-exhaustive list of fifteen "mitigating circumstances" that a court shall consider when sentencing a juvenile who has been tried and convicted of a felony as an adult).

[52] Ark. Code § 16-93-621(b)(1)-(2) (instructing the parole board to take into consideration a minor's diminished capacity as compared to that of adults; features of youth; growth and maturity of the person during incarceration; the person's age at the time of the offense; immaturity of the person during the offense; whether and to what extent an adult was involved in the offense; the person's family circumstances, including any history of abuse, trauma, or involvement in the child welfare system; and other factors).

[53] W. Va. Code § 62-12-13b.

[54] Conn. Gen. Stat. § 54-125a(f)(4).

culpability of minors as compared to that of adults."[55] The Oregon Parole Board is also directed to consider family and community circumstances at the time of the offense, including any history of abuse, trauma and involvement in the juvenile dependency system, as well as subsequent emotional growth and increased maturity and participation in rehabilitative and educational programs while in custody.[56] Additionally, Connecticut, Illinois, and Oregon all require that counsel be appointed for indigent juvenile offenders for their parole hearings.[57]

### *State court decisions*

The state courts have also been active in implementing the core constitutional principles of *Miller*, particularly in jurisdictions where there have not been comprehensive legislative reforms.

Some state courts have read *Miller*'s holding narrowly to apply only to mandatory sentences that are formally designated "life without parole" sentences.[58]

---

[55] Or. Rev. Stat. § 144.397(5).

[56] *Id.*

[57] Conn. Gen. Stat. § 54-125a(f)(3); 730 Ill. Comp. Stat. 5/5-4.5-115(e); Or. Rev. Stat. § 144.397(12).

[58] *See, e.g.*, *Lucero v. People*, 394 P.3d 1128, 1132-33 (Colo. 2017) (holding that *Graham* and *Miller* do not apply to aggregate term-of-years sentences); *Veal v. State*, 810 S.E.2d 127, 129 (Ga. 2018) (holding that a sentencer need not consider a juvenile's youth and its attendant characteristics before imposing a non-life-without-parole sentence and affirming a sentence of 60 years of prison service before a parole opportunity); *Wilson v. State*, 157 N.E.3d 1163, 1174-76 (Ind. 2020) (concluding that *Miller* does not apply to term-of-years sentences, even if they are *de facto* life sentences); *Willbanks v. Dep't of Corr.*, 522 S.W.3d 238, 244-46 (Mo. 2017) (rejecting the argument that *Graham* bars consecutive sentences that are the functional equivalent of life without parole and affirming a sentence for a non-

(continued...)

However, many state courts have applied *Miller* to discretionary sentences and to term-of-years sentences that are the functional equivalent of a life without parole sentence.[59]

[58]   (...continued)
homicide juvenile offender that did not allow for parole eligibility until age eighty-five); *see also State v. Ali*, 895 N.W.2d 237, 241-46 (Minn. 2017) (holding that *Miller* does not apply to defendants sentenced to consecutive term-of-years sentences for multiple crimes).

[59]   *See, e.g.*, *State v. Riley*, 110 A.3d 1205, 1213 (Conn. 2015) (holding that "the dictates set forth in *Miller* may be violated even when the sentencing authority has discretion to impose a lesser sentence than life without parole if it fails to give due weight to evidence that *Miller* deemed constitutionally significant before determining that such a severe punishment is appropriate"); *State v. Shanahan*, 445 P.3d 152, 159 (Idaho 2019) (concluding that the rationale of *Miller* "also extend[s] to lengthy fixed sentences that are the functional equivalent of a determinate life sentence"); *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) (per curiam) ("[W]e hold that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment."); *People v. Holman*, 91 N.E.3d 849, 861 (Ill. 2017) ("The greater weight of authority has concluded that *Miller* and *Montgomery* send an unequivocal message:  Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment unless the trial court considers youth and its attendant characteristics."); *State v. Ragland*, 836 N.W.2d 107, 121-22 (Iowa 2013) (holding under the Eighth Amendment and Iowa Constitution that "*Miller* applies to sentences that are the functional equivalent of life without parole"); *Carter v. State*, 192 A.3d 695, 725 (Md. App. 2018) ("The initial question is whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment.  It seems a matter of common sense that the answer must be 'yes.'"); *State ex rel. Carr v. Wallace*, 527 S.W.3d 55, 60-62 (Mo. 2017) (applying *Miller* to a mandatory term of life with the possibility of parole after 50 years); *Steilman v. Michael*, 407 P.3d 313, 318-19 (Mont. 2017) (concluding that "*Miller's* substantive rule requires Montana's sentencing judges to adequately consider the mitigating characteristics of youth set forth in the *Miller* factors when sentencing juvenile offenders to life without the possibility of parole, irrespective of whether the life sentence was discretionary" and that "[l]ogically, the requirement to consider how 'children are different' cannot be limited to de jure life sentences when a lengthy sentence denominated in a number of years will effectively result in the juvenile offender's imprisonment for life");

(continued...)

Most of the state courts that have applied *Miller* to term-of-years sentences that qualify as *de facto* life without parole sentences have done so under the federal constitution as a matter of "common sense." As one Maryland appellate court explained:

> The initial question is whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment. It seems a matter of common sense that the answer must be "yes." Otherwise, the Eighth Amendment proscription against cruel and unusual punishment in the context of a juvenile offender could be circumvented simply by stating the sentence in numerical terms that exceed any reasonable life expectancy rather than labeling it a "life" sentence. The vast majority of state supreme courts to

---

[59] (...continued) *State v. Kelliher*, 873 S.E.2d 366, 381, 390 (N.C. 2022) (concluding under the Eighth Amendment that *Miller* applies to a sentence of life with the possibility of parole after 50 years and further holding, under the North Carolina Constitution, that 40 years is the threshold for whether a sentence constitutes a *de facto* life without parole sentence); *State v. Zuber*, 152 A.3d 197, 212 (N.J. 2017) ("[W]e find that the force and logic of *Miller's* concerns apply broadly: to cases in which a defendant commits multiple offenses during a single criminal episode; to cases in which a defendant commits multiple offenses on different occasions; and to homicide and non-homicide cases."); *Ira v. Janecka*, 419 P.3d 161, 167 (N.M. 2018) ("We conclude that the analysis contained within *Roper* and its progeny should be applied to a multiple term-of-years sentence."); *White v. Premo*, 443 P.3d 597, 604-07 (Or. 2019) (applying *Miller* to a discretionary sentence that allowed for release after 54 years); *Aiken v. Byars*, 765 S.E.2d 572, 577 (S.C. 2014) ("*Miller* does more than ban mandatory life sentencing schemes for juveniles; it establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered."); *State v. Ramos*, 387 P.3d 650, 659 (Wash. 2017) ("We now join the majority of jurisdictions that have considered the question and hold that *Miller* does apply to juvenile homicide offenders facing *de facto* life-without-parole sentences."); *Bear Cloud v. State*, 334 P.3d 132, 141-42 (Wyo. 2014) ("We hold that the teachings of the *Roper/Graham/Miller* trilogy require sentencing courts to provide an individualized sentencing hearing to weigh the factors for determining a juvenile's 'diminished culpability and greater prospects for reform' when, as here, the aggregate sentences result in the functional equivalent of life without parole.").

consider this question agree that a sentence stated as a term of years, or as a life sentence with parole after a specified number of years, can fall within the scope of *Graham* or *Miller* as a *de facto* sentence of life without parole.[60]

Although the majority of state courts have relied on the Eighth Amendment to expand the protections of *Miller* to term-of-years sentences that qualify as the functional equivalent of a life without parole sentence, some state courts have also relied on their state constitutions to interpret and implement *Miller*.

In *State v. Ragland*, issued just over a year after *Miller*, the Iowa Supreme Court relied on both the Eighth Amendment and Article I, Section 17 of the Iowa Constitution to extend the protections of *Miller* to a term-of-years sentence that was the functional equivalent of life without parole.[61] Like many of the other state supreme courts, the Iowa Supreme Court viewed this extension of *Miller* as a simple matter of logic. As the court explained in *Ragland*:

> [T]he rationale of *Miller*, as well as *Graham*, reveals that the unconstitutional imposition of a mandatory life-without-parole sentence is not fixed by substituting it with a sentence with parole that is the practical equivalent of a life sentence without parole. Oftentimes, it is important that the spirit of the law not be lost in the application of the law. This is one such time.[62]

The defendant in *Ragland* had originally been sentenced to a mandatory life without parole sentence.[63] However, after *Miller* was issued, the governor of Iowa

---

60    *Carter*, 192 A.3d at 725.

61    *Ragland*, 836 N.W.2d at 113, 118-22.

62    *Id.* at 121.

63    *Id.* at 110.

commuted all juvenile life without parole sentences to sentences of life with the possibility of parole after 60 years.[64] The Iowa Supreme Court struck down this post-commutation sentence as unconstitutional under both the federal and state constitutions because it concluded that the sentence qualified as a *de facto* life without parole sentence that had been imposed without proper consideration of the *Miller* factors.[65] As the court explained:

> The spirit of the constitutional mandates of *Miller* and *Graham* instruct that much more is at stake in the sentencing of juveniles than merely making sure that parole is possible. In light of our increased understanding of the decision making of youths, the sentencing process must be tailored to account in a meaningful way for the attributes of juveniles that are distinct from adult conduct.[66]

On the same day that it issued *Ragland*, the Iowa Supreme Court also issued *State v. Null* and *State v. Pearson*.[67] In *Null*, the court held that *Miller* applied to a 75-year aggregate term-of-years sentence that required the defendant to serve at least 52.5 years before becoming eligible for parole.[68] And in *Pearson*, the court held that a sentence that required a juvenile convicted of non-homicide crimes to serve 35 years

---

[64] *Id.* at 110-11.

[65] *Id.* at 113, 118-22 (noting that defendant would be seventy-eight years old at the time he was first eligible for parole).

[66] *Id.* at 121.

[67] *State v. Null*, 836 N.W.2d 41 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013).

[68] *Null*, 836 N.W.2d at 45, 71.

before becoming eligible for parole constituted an unconstitutional *de facto* life without parole sentence.[69]

A year later, the Iowa Supreme Court relied on its independent state constitutional analysis to extend *Miller* protections to all juvenile sentences, regardless of their length. In *State v. Lyle*, the court struck down all mandatory minimum sentences as they applied to juvenile offenders on the ground that the mandatory nature violated the principles of *Miller* as interpreted under the Iowa Constitution.[70] As the court explained:

> Our constitution demands that we do better for youthful offenders — all youthful offenders, not just those who commit the most serious crimes. Some juveniles will deserve mandatory minimum imprisonment, but others may not. A statute that sends all juvenile offenders to prison for a minimum period of time under all circumstances simply cannot satisfy the standards of decency and fairness embedded in article I, section 17 of the Iowa Constitution.[71]

Two years later, in *State v. Sweet*, the Iowa Supreme Court again relied on its state constitutional prohibition against cruel and unusual punishment to categorically ban all life without parole sentences for juvenile offenders under Iowa law, reasoning that trial courts should not be required "to predict future prospects for maturation and rehabilitation when highly trained professionals say such predictions are impossible."[72]

---

[69] *Pearson*, 836 N.W.2d at 96.

[70] *State v. Lyle*, 854 N.W.2d 378, 404 (Iowa 2014).

[71] *Id.* at 403.

[72] *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016) (holding that a sentence of life without the possibility of parole for a juvenile offender violates Article I, Section 17 of the Iowa Constitution).

The Massachusetts Supreme Judicial Court has also extended its state constitutional protections to the *Miller* line of cases. In 2013, soon after *Miller* was issued, the court issued *Diatchenko v. District Attorney for the Suffolk District* (*Diatchenko I*), in which it categorically banned all juvenile life without parole sentences under the Massachusetts Constitution.[73] The court reasoned that "because the brain of a juvenile is not fully developed, either structurally or functionally, by the age of eighteen, a judge cannot find with confidence that a particular offender, at that point in time, is irretrievably depraved."[74] The court further concluded that retroactive application of this prohibition was required because retroactive application "ensures that juvenile homicide offenders do not face a punishment that our criminal law cannot constitutionally impose on them."[75] Diatchenko had been sentenced to mandatory life without parole for a murder he committed in 1981 when he was seventeen years old.[76] In accordance with its holding, the court remanded the case to the trial court with directions that the defendant, who had served 31 years of his sentence, be considered for

---

[73] *Diatchenko v. Dist. Att'y for Suffolk Dist.* (*Diatchenko I*), 1 N.E.3d 270, 282, 284-85 (Mass. 2013) (recognizing its "inherent authority 'to interpret [S]tate constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution'" (alteration in original) (quoting *Libertarian Ass'n of Mass. v. Sec'y of Commonwealth*, 969 N.E.2d 1095, 1111 (Mass 2012))).

[74] *Id.* at 284.

[75] *Id.* at 281. Additionally, as the Massachusetts Supreme Judicial Court explained, "the imposition of a sentence of life in prison without the possibility of parole for the commission of murder in the first degree by a juvenile under the age of eighteen is disproportionate not with respect to the offense itself, but with regard to the particular offender." *Id.* at 283.

[76] *Id.* at 274.

parole and given a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."[77]

In a later follow-up to *Diatchenko I*, the Massachusetts Supreme Judicial Court issued *Diatchenko II*, in which it held, under its state constitution, that juvenile offenders tried as adults were constitutionally entitled to the assistance of counsel and expert funds at their parole hearings.[78]

The New Jersey Supreme Court has similarly relied on its state constitution to interpret and implement the constitutional principles underlying *Miller*. In *State v. Zuber*, the New Jersey Supreme Court held that the term-of-years sentences of two juveniles constituted *de facto* life without parole sentences under both the Eighth Amendment and Article I, Paragraph 12 of the New Jersey Constitution.[79] One juvenile, Zuber, had been sentenced to 110 years with the possibility of parole after 55 years, when he would be about seventy-two years old; the other, Comer, was sentenced to 75 years with the possibility of parole after 68 years and 3 months, when he would be eighty-five years old.[80] The court reasoned:

---

[77] *Id.* at 286-87 (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010)).

[78] *Diatchenko v. Dist. Att'y for Suffolk Dist.* (*Diatchenko II*), 27 N.E.3d 349, 361, 363-64 (Mass. 2015). After the decisions in *Diatchenko I* and *II*, the Massachusetts legislature enacted legislation that provided for a mandatory sentence of life imprisonment with the possibility of parole no later than 30 years for juveniles convicted of first-degree murder. *Commonwealth v. Watt*, 146 N.E.3d 414, 426 n.11 (Mass. 2020) (discussing Mass. Gen. Laws ch. 279, § 24).

[79] *State v. Zuber*, 152 A.3d 197, 212-13 (N.J. 2017).

[80] *Id.* at 203-04, 213 ("Defendants' potential release after five or six decades of incarceration, when they would be in their seventies and eighties, implicates the principles of *Graham* and *Miller*.").

*Miller*'s command that a sentencing judge "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," applies with equal strength to a sentence that is the practical equivalent of life without parole. Defendants who serve lengthy term-of-years sentences that amount to life without parole should be no worse off than defendants whose sentences carry that formal designation. The label alone cannot control; we decline to elevate form over substance.[81]

Various amici filed briefs in *Zuber*, arguing that the New Jersey Supreme Court should adopt either "a thirty-year maximum period of parole ineligibility as a uniform rule for juvenile offenders," "a bright-line rule that would allow juveniles to petition for resentencing and release at a point no later than thirty years into their sentences," or sentence review "within ten to fifteen years of the offense and at regular intervals afterward."[82] The court declined to adopt any of these approaches, deferring to the New Jersey legislature on that question.[83] The court nevertheless noted that other state legislatures had enacted similar reforms and it encouraged the New Jersey legislature to examine the issue "[t]o avoid a potential constitutional challenge in the future."[84]

However, when the New Jersey legislature failed to act, the New Jersey Supreme Court took further action under its state constitution. In *State v. Comer*, the New Jersey Supreme Court addressed the sentences of two juveniles who had been resentenced under *Miller* and *Zuber* — Comer, who was one of the two juveniles in

---

[81]   *Id.* at 211-12 (quoting *Miller v. Alabama*, 567 U.S. 460, 480 (2012)).

[82]   *Id.* at 205-06.

[83]   *Id.* at 214-15.

[84]   *Id.* at 215.

*Zuber*, and Zarate, whose case the court had summarily remanded for resentencing following its ruling in *Zuber*.[85] Comer was resentenced to 30 years in prison without the possibility of parole.[86] Zarate was resentenced to 50 years in prison with the possibility of parole after serving eighty-five percent of the sentence — a sentence that made him parole eligible at age fifty-six.[87]

The two juveniles appealed their sentences, arguing that their sentences were unconstitutional under *Miller* and *Zuber*.[88] On appeal, the New Jersey Supreme Court emphasized the changing landscape of juvenile sentencing, focusing on the legislative reforms that had taken place in other states and the sentences that most juvenile offenders had received following their resentencing after *Miller*.[89] The court ultimately concluded that these "sources and trends all suggest that a 30-year parole bar does not conform to contemporary standards of decency."[90] After holding that the New Jersey Constitution provided greater protection than the Eighth Amendment, the court then adopted a procedure by which juvenile offenders in New Jersey could petition the trial court for resentencing after they served 20 years.[91]

The court explained that, under this procedure, the judge would be required to consider the *Miller* factors at the hearing on the petition, and the judge would have the benefit of information about the juvenile's behavior in prison and any rehabilitative

---

[85]   *State v. Comer*, 266 A.3d 374, 381-87 (N.J. 2022).

[86]   *Id.* at 382.

[87]   *Id.* at 386.

[88]   *Id.* at 387-88.

[89]   *Id.* at 394-96.

[90]   *Id.* at 396.

[91]   *Id.* at 399.

efforts the juvenile may have made.[92] "After evaluating all the evidence, the trial court would have discretion to affirm or reduce a defendant's original base sentence within the statutory range, and to reduce the parole bar below the statutory limit to no less than 20 years."[93] The court noted, however, that "[t]he Legislature, as a matter of policy, still has the authority to select a shorter time frame for the look-back period."[94]

Two other state courts have also expanded the *Miller* holding under their state constitutions. In *State v. Bassett*, the Washington Supreme Court relied on "a clear trend of states rapidly abandoning or curtailing juvenile life without parole sentences" to eliminate life without parole sentences for juveniles in Washington, holding that such sentences constitute cruel punishment under Article I, Section 14 of the Washington Constitution.[95] And, in a recent case, *State v. Kelliher*, the North Carolina Supreme Court relied on its independent state constitutional prohibition against cruel or unusual punishment to hold that sentences that require the juvenile offender to serve more than 40 years before becoming eligible for parole are *de facto* life without parole sentences for purposes of triggering *Miller*.[96]

---

[92]   *Id.* at 399-400.

[93]   *Id.* at 400.

[94]   *Id.* at 401.

[95]   *State v. Bassett*, 428 P.3d 343, 352 (Wash. 2018). The court explained that "[u]nder the two-pronged categorical bar analysis, we find that states are rapidly abandoning juvenile life without parole sentences, children are less criminally culpable than adults, and the characteristics of youth do not support the penological goals of a life without parole sentence. Thus, we hold that sentencing juvenile offenders to life without parole or early release is cruel punishment and therefore RCW 10.95.030(3)(a)(ii) is unconstitutional under article I, section 14." *Id.* at 354.

[96]   *State v. Kelliher*, 873 S.E.2d 366, 390 (N.C. 2022).

It is against this backdrop of state legislative reforms and state supreme court decisions that the United States Supreme Court issued *Jones v. Mississippi*.

*The United States Supreme Court's decision in* <u>Jones v. Mississippi</u>

In 2021, while Fletcher's appeal was still pending before this Court, the United States Supreme Court issued *Jones v. Mississippi*, its fifth decision involving juvenile sentencing.[97]

In *Jones*, the Court reaffirmed the central principles underlying its prior decisions.[98] That is, the Court reaffirmed that children are different than adults for purposes of sentencing and that "youth matters in sentencing."[99] The Court also made clear that it was not overruling *Miller* or *Montgomery*, and that a sentence of life without parole remained disproportionate and unconstitutional under the Eighth Amendment when applied to juvenile offenders whose crimes reflect unfortunate but transient immaturity.[100]

The *Jones* Court nevertheless narrowed the broad federal constitutional mandate that many state courts had interpreted *Miller* and *Montgomery* as instituting. The defendant in *Jones* argued — in line with the holdings reached by many state and federal courts — that *Miller* required a sentencing court to provide an on-the-record

---

[97]   *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).

[98]   *Id.* at 1321.

[99]   *Id*. at 1316.

[100]  *Id.* at 1321 ("Today's decision does not overrule *Miller* or *Montgomery*."); *see also id.* at 1315 n.2 ("That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016))).

sentencing explanation of the *Miller* factors and/or an explicit or implicit finding of "permanent incorrigibility" before the Court could lawfully impose a discretionary sentence of life without parole on a juvenile offender.[101] Although three justices agreed with this position, a majority of the Court rejected it, concluding that *Miller* did not require anything more than the existence of a discretionary sentencing scheme under which such findings could be made.[102]

The *Jones* Court offered four reasons for reading *Miller* narrowly. First, the Court concluded that an on-the-record sentencing explanation was unnecessary because, according to the Court, "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth."[103]

Second, the Court emphasized that neither *Miller* nor *Montgomery* had expressly stated that an on-the-record sentencing explanation and/or a finding of permanent incorrigibility was required before a sentence of life without parole could lawfully be imposed.[104]

Third, the Court pointed out that requiring an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility would be inconsistent with the Court's death penalty cases, which have not required such explanations. As the Court explained:

---

[101] *Id.* at 1313.

[102] *Id.* (majority opinion); *see also id.* at 1336 (Sotomayor, J., dissenting) (noting that fifteen state supreme courts had interpreted *Miller* as requiring a finding of permanent incorrigibility before imposing a life without parole sentence and that the legislatures of twenty states and the District of Columbia had changed their policies to prohibit life without parole sentences for all juvenile offenders).

[103] *Id.* at 1319.

[104] *Id.* at 1320.

In a series of capital cases over the past 45 years, the Court has required the sentencer to consider mitigating circumstances when deciding whether to impose the death penalty. But the Court has *never* required an on-the-record sentencing explanation or an implicit finding regarding those mitigating circumstances.[105]

According to the Court, there is no reason for an on-the-record sentencing explanation in death penalty cases, because one can again assume that "the sentencer will necessarily consider relevant mitigating circumstances."[106] The Court therefore concluded that if "[a] sentencing explanation is not necessary to ensure that the sentencer in death penalty cases considers the relevant mitigating circumstances[,] [i]t follows that a sentencing explanation is likewise not necessary to ensure that the sentencer in juvenile life-without-parole cases considers the defendant's youth."[107]

Lastly, the Court asserted that "an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not dictated by any historical or contemporary sentencing practice in the States."[108] The Court acknowledged that judges will "often" provide an on-the record explanation, particularly when imposing a lengthy sentence.[109] The Court also acknowledged that many states required such an on-the-record explanation.[110] But the Court noted that this requirement was not universal among

---

[105] *Id.* (citations omitted).

[106] *Id.*

[107] *Id.*

[108] *Id.* at 1321.

[109] *Id.*

[110] *Id.* As we discuss later in this opinion, Alaska counts among the states that require on-the-record sentencing explanations.

the states, and the Court therefore concluded that the principles of federalism weighed against imposing such a procedural requirement under the federal constitution.[111] As the Court explained, the state practices matter because "when 'a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems.'"[112]

The *Jones* Court emphasized, however, that the states were still free to impose their own additional procedural requirements:

> States may categorically prohibit life without parole for all offenders under 18. Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States.[113]

---

[111] *Id.*

[112] *Id.* (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016)) ("Because *Montgomery* directs us to 'avoid intruding more than necessary' upon the States, and because a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth, we should not now add still more procedural requirements." (citation omitted)).

[113] *Id.* at 1323 (citing Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (2018)).

Indeed, as the Court recognized, many states had already responded to *Miller* and *Montgomery* by adopting one or more of those reforms.[114]

> *Because Fletcher was sentenced pursuant to a discretionary sentencing scheme, Fletcher does not have a federal constitutional claim for relief*

With the issuance of *Jones v. Mississippi*, any federal constitutional claim that Fletcher may have had under *Miller* is now foreclosed. Unlike the life without parole sentence in *Miller*, Fletcher's 135-year sentence (with normal statutory eligibility for parole) was not mandated by law. That is, the sentencing court had the discretion to sentence Fletcher to a term of imprisonment that was higher or lower than the sentence she received.[115] Under *Jones*, the existence of that sentencing discretion was both "necessary and constitutionally sufficient" to ensure the constitutionality of her sentence for purposes of the federal constitution.[116] We therefore conclude that Fletcher does not have an Eighth Amendment claim for resentencing.

But this does not end our analysis. Fletcher also raises a state constitutional claim under Article I, Section 12 of the Alaska Constitution.[117] As already discussed, a

---

[114] *Id.*

[115] At the time of Fletcher's sentencing, an adult defendant convicted of first-degree murder faced a sentence of 20 to 99 years, and an adult defendant convicted of second-degree murder faced a sentence of 5 to 99 years. *See* former AS 12.55.125(a) & (b) (1985). And the sentencing judge had discretion whether to impose these sentences concurrently or consecutively. *See State v. Andrews*, 707 P.2d 900, 905-10 (Alaska App. 1985), *aff'd*, 723 P.2d 85 (Alaska 1986) (mem.). The judge also had discretion to restrict discretionary parole eligibility. *See* former AS 33.15.230(a)(1) & (2) (1985).

[116] *Jones*, 141 S. Ct. at 1313.

[117] Alaska Const. art. I, § 12 ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

number of state courts have relied on their state constitutions to implement and, at times, expand the constitutional principles underlying *Miller*. Alaska has a robust tradition of independent state constitutional analysis, and it is not uncommon for our appellate courts to interpret the Alaska Constitution as providing more protection than its federal counterpart.[118] Accordingly, we now turn to our consideration of Fletcher's state constitutional claim.

> *Why we conclude that the Alaska Constitution requires Alaska courts to affirmatively consider a juvenile offender's youth and the attendant characteristics of youth before sentencing a juvenile offender tried as an adult to a sentence of life without parole or its functional equivalent*

We interpret the Alaska Constitution using our independent judgment, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[119]

---

[118] *See, e.g.*, *Club SinRock, LLC v. Anchorage, Off. of Mun. Clerk*, 445 P.3d 1031, 1036-37 (Alaska 2019) ("[W]e are not bound by decisions of the United States Supreme Court on similar federal provisions but may determine that Alaska provides greater protection for individual rights."); *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1060 (Alaska 2005) ("[W]e have often held that Alaska's constitution is more protective of rights and liberties than is the United States Constitution."); *Malabed v. N. Slope Borough*, 70 P.3d 416, 420 (Alaska 2003) ("We have long recognized that the Alaska Constitution's equal protection clause affords greater protection to individual rights than the United States Constitution's Fourteenth Amendment."); *Grinols v. State*, 74 P.3d 889, 895 (Alaska 2003) (interpreting the Alaska Constitution's due process clause as more protective than the federal clause in the context of post-conviction relief litigation); *State v. Jones*, 706 P.2d 317, 324 (Alaska 1985) (reading the Alaska Constitution's prohibition on unreasonable searches and seizures more expansively than the federal prohibition); *State v. Browder*, 486 P.2d 925, 935-37 (Alaska 1971) (interpreting the state constitutional right to a jury trial in criminal contempt cases more broadly than the federal right).

[119] *Grinols*, 74 P.3d at 891 (alteration in original) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

As a general matter, "[w]hen a defendant asserts that the Alaska Constitution affords greater protection than the corresponding provision of the Federal Constitution, it is the defendant's burden to demonstrate something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation."[120] Accordingly, we begin our analysis with the text of Article I, Section 12. This provision states, in pertinent part, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[121] The Eighth Amendment contains identical language.[122] For the most part, we have interpreted the Alaska prohibition on cruel and unusual punishment in line with its federal counterpart, although we have also noted that "[t]he Alaska Constitution's prohibition on cruel and unusual punishments might potentially be construed more broadly than its federal counterpart."[123]

Both the state and federal prohibitions against cruel and unusual punishment encompass "the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense."[124] This precept requires the court to look at both the nature of the offender as well as the nature of the

---

[120] *State v. Zerkel*, 900 P.2d 744, 758 n.8 (Alaska App. 1995).

[121] Alaska Const. art. I, § 12.

[122] U.S. Const. amend. VIII.

[123] *Sikeo v. State*, 258 P.3d 906, 912 (Alaska App. 2011).

[124] *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)); *see also Gray v. State*, 267 P.3d 667, 671 (Alaska App. 2011) (acknowledging that Alaska's cruel and unusual punishment prohibition concerns both "the characteristics of the penalty imposed" and "the characteristics of the offender").

offense, and has resulted in categorical prohibitions of certain types of sentences for certain types of offenders.[125]

In *Miller* and *Montgomery*, the United States Supreme Court distinguished between two different categories of juvenile offenders.[126] The first category included "the vast majority of juvenile offenders"[127] whose crimes, because of the distinctive attributes of youth, reflected only "unfortunate yet transient immaturity."[128] The second category involved those "rare" juvenile offenders whose crime reflected "irreparable corruption."[129] The *Miller* Court held (and the *Montgomery* Court further clarified) that a life without parole sentence would violate the Eighth Amendment's prohibition against cruel and unusual punishment when imposed against the first category of juvenile offenders (the "transient immaturity" juveniles).[130] In contrast, a life without parole

---

[125] *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that applying the death penalty to defendants with mental retardation is cruel and unusual); *Roper*, 543 U.S. at 578 (holding that applying the death penalty to juvenile offenders is cruel and unusual); *Graham v. Florida*, 560 U.S. 48, 74, 82 (2010) (holding that life without parole sentences for juveniles who commit non-homicide offenses are cruel and unusual).

[126] *Miller*, 567 U.S. at 479-80; *Montgomery v. Louisiana*, 577 U.S. 190, 208-09 (2016).

[127] *Montgomery*, 577 U.S. at 209.

[128] *Miller*, 567 U.S. at 479 (quoting *Roper*, 543 U.S. at 573 and *Graham*, 560 U.S. at 68); *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479).

[129] *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573 and *Graham*, 560 U.S. at 68); *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479-80).

[130] *Miller*, 567 U.S. at 479-80; *Montgomery*, 577 U.S. at 210 ("A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. The hearing does not replace but rather gives effect to *Miller's* substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient

(continued...)

sentence could lawfully be imposed on those "rare" juvenile offenders who were "irreparabl[y] corrupt[]."[131] Thus, the mandatory sentencing scheme in *Miller* was unconstitutional because it provided no opportunity for the sentencing court to determine whether the juvenile offender being sentenced was one of those "rare" juvenile offenders who could constitutionally be sentenced to life without parole.[132]

This categorization of juvenile offenders into two groups — the "transient immaturity" juveniles for whom a sentence of life without parole would violate the Eighth Amendment and the "irreparable corruption" juveniles whose life without parole sentences would not violate the Eighth Amendment — survives *Jones*.[133] As the Court expressly stated in *Jones*, "Today's decision does not overrule *Miller* or *Montgomery*."[134] And in a footnote, the *Jones* Court quoted the following passage from *Montgomery*:

> That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment.[135]

Thus, the constitutional question before us in this case is not whether sentencing a juvenile offender whose crime reflects transient immaturity to life without

---

[130] (...continued) immaturity." (quoting *Miller*, 567 U.S. at 465)).

[131] *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573 and *Graham*, 560 U.S. at 68); *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. 479-80).

[132] *Miller*, 567 U.S. at 479 (quoting *Roper*, 543 U.S. at 573 and *Graham*, 560 U.S. at 68).

[133] *Jones v. Mississippi*, 141 S. Ct. 1307, 1317-18 (2021).

[134] *Id*. at 1321.

[135] *Id.* at 1315 n.2 (quoting *Montgomery*, 577 U.S. at 211).

parole violates the Alaska Constitution's prohibition against cruel and unusual punishment. That question has already been answered in the affirmative for purposes of the federal constitution by the United States Supreme Court in *Miller* and *Montgomery* (as acknowledged in *Jones*). And, under the principles of federalism, the Alaska Constitution must be at least as protective as its federal counterpart.[136]

Instead, the question before us is whether the Alaska Constitution requires greater procedural protections than the federal constitution when sentencing a juvenile offender to guard against the possibility that a court might sentence a juvenile offender to an unconstitutional life without parole sentence.[137] In *Jones*, the United States Supreme Court concluded that, for purposes of the federal constitution, "a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient."[138] In other words, the federal constitution requires only that sentencing courts have *the opportunity* to consider a juvenile offender's youth and its attendant characteristics, but once such an opportunity exists, one can apparently assume (for purposes of the federal constitution) that the appropriate considerations will be addressed

---

[136] *See Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004) (explaining that Alaska courts "may not undermine the minimum protections established by the United States Supreme Court's interpretations of the Federal Constitution" but that the courts "are under a duty[] to develop additional constitutional rights and privileges . . . [that are] necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage" (quoting *Baker v. Fairbanks*, 471 P.2d 386, 401 (Alaska 1970))).

[137] *Cf. State v. Purcell,* 203 A.3d 542, 556 (Conn. 2019) (discussing a state court's authority under its state constitution "to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights" in the *Miranda* context); *State v. Dickson*, 141 A.3d 810, 825 n.11 (Conn. 2016) ("[I]t is well established that courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to *prevent* the significant risk of a constitutional violation.").

[138] *Jones*, 141 S. Ct. at 1313.

and that the court will not sentence a juvenile whose crime reflects transient immaturity to an unconstitutional sentence of life without parole.[139]

We conclude that the Alaska Constitution requires more than just an unverified assumption that the sentencing court will apply the correct criteria and impose a constitutional sentence. We therefore hold, as a number of jurisdictions have, that the constitutional principles underlying *Miller* apply to discretionary life without parole sentences (or their functional equivalents). We further hold that, before a sentencing court can impose a sentence of life without parole (or its functional equivalent) on a juvenile offender tried as an adult, the Alaska Constitution requires a sentencing court to affirmatively consider the juvenile offender's youth and its attendant characteristics and to provide an on-the-record sentencing explanation that explicitly or implicitly finds that the juvenile offender is one of the "rare" juvenile offenders "whose crime reflects irreparable corruption."[140] We come to this holding for two reasons.

First, the federalist concerns that led to the restrained approach adopted by *Jones* are not at issue when state courts are determining the scope and meaning of their own independent state constitutions.[141] Indeed, as already explained, *Jones* largely rests on the assumption that individual states will adopt (or in many cases have already

---

[139] *Id.* at 1319 ("But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth . . . .").

[140] *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005) and *Graham v. Florida*, 560 U.S. 48, 68 (2010)); *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479-80).

[141] *See Jones*, 141 S. Ct. at 1321 ("Those state practices matter here because, as the Court explained in *Montgomery*, when 'a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the State's sovereign administration of their criminal justice systems.'" (quoting *Montgomery*, 577 U.S. at 211)).

adopted) additional procedures or remedies above those required by the federal constitution.[142] We note that *Jones* cites to Judge Jeffrey Sutton's seminal work on independent state constitutional analysis, *51 Imperfect Solutions*, further reflecting the Court's understanding that the states (including the state courts) would develop their own procedures to protect the federal rights identified in *Miller* and *Montgomery*.[143]

Second, unlike the federal death penalty law cited in *Jones*, Alaska law has a well-established tradition of requiring on-the-record sentencing explanations and meaningful appellate review of criminal sentences. This tradition is itself grounded in two state constitutional provisions: Article IV, Section 2 and Article I, Section 12 of the Alaska Constitution.

Article IV, Section 2 provides, in pertinent part, that the Alaska Supreme Court "shall be the highest court of the State, with final appellate jurisdiction." In *Wharton v. State*, the Alaska Supreme Court interpreted this provision as granting the supreme court the inherent power to review criminal sentences.[144] But in order to

---

[142] *Id.* at 1323 ("States may categorically prohibit life without parole for all offenders under 18. Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States." (citing Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (2018))).

[143] *Id.*

[144] *Wharton v. State*, 590 P.2d 427, 428-29 (Alaska 1979) (overruling *Bear v. State*, 439 P.2d 432 (Alaska 1968) and interpreting Article IV, Section 2 as granting the supreme court inherent authority to review criminal sentences); *see also Mund v. State*, 325 P.3d 535, 539-41 (Alaska App. 2014) (reviewing constitutional and legislative history of sentence review in Alaska); *Coffman v. State*, 172 P.3d 804, 808-09 (Alaska App. 2007) (explaining that

(continued...)

provide meaningful appellate review, the sentencing court must provide a sufficiently detailed record of its reasoning. As the Alaska Supreme Court stated in *State v. Bumpus*, "[a] reviewing court cannot determine the appropriateness of a sentence where the sentencing court has failed to make adequate findings, or, in the case of psychological evaluations, has not obtained necessary information."[145] The court explained that "[w]ithout articulated findings concerning the factors that determine the range of reasonable sentences," any sentence is "arbitrary and unsupportable."[146]

Numerous decisions of the Alaska Supreme Court and this Court have therefore emphasized the importance of an on-the-record sentencing explanation. In *Perrin v. State*, for example, the Alaska Supreme Court stressed that "a thorough explanation for the sentence imposed by the trial judge" not only assisted in facilitating appellate review but also helped "promote respect for the law by . . . increasing the fairness of the sentencing process."[147] The supreme court noted that "a good sentence is one which can be reasonably explained," and that there were numerous independent reasons for requiring such on-the-record explanations.[148] This Court later summarized those reasons in *Houston v. State*:

> [A] full explanation of a sentencing decision contributes to the rationality of the sentence, facilitates the reviewing

---

[144] (...continued)
legislative enactments define the procedures through which sentence appeals are obtained but the court's inherent authority to review sentences is constitutionally grounded).

[145] *State v. Bumpus*, 820 P.2d 298, 305 (Alaska 1991).

[146] *Id.*

[147] *Perrin v. State*, 543 P.2d 413, 418 (Alaska 1975) (omission in original).

[148] *Id.* (quoting Youngdahl, *Remarks Opening the Sentence Institute Program, Denver Colorado*, 35 F.R.D. 387, 388 (1964)).

court's evaluation of the propriety of the sentence, and fosters public confidence in the criminal justice system. A full explanation may also aid the correctional authorities and have therapeutic value in assisting the defendant to accept his sentence without bitterness.[149]

The contents of the on-the-record sentencing explanation are also constitutionally based. When the Alaska Constitution was first adopted, the second sentence of Article I, Section 12 stated, in relevant part, "Penal administration shall be based on the principle of reformation and upon the need for protecting the public."[150] In *State v. Chaney*, the Alaska Supreme Court held that this constitutional provision encompassed various sentencing goals that are now generally referred to as the "*Chaney* criteria."[151] As the supreme court explained:

---

[149] *Houston v. State*, 648 P.2d 1024, 1027 (Alaska App. 1982) (citing *Alpiak v. State*, 581 P.2d 664, 665 n.2 (Alaska 1978), *Perrin*, 543 P.2d at 418, and *State v. Chaney*, 477 P.2d 441, 447 n.26 (Alaska 1970)); *see also Chaney*, 477 P.2d at 443-44 (listing objectives of sentence review and criteria courts should consider when sentencing); *Asitonia v. State*, 508 P.3d 1023, 1025 (Alaska 1973) (explaining that an appellate court is "obliged to consider the manner in which the sentence was imposed, including the sufficiency and accuracy of the information upon which it was based"); *State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975) (holding that the sentencing court should not impose a maximum sentence without either an explicit or implicit worst offender finding); *Jackson v. State*, 616 P.2d 23, 25 (Alaska 1980) (stating that a sentencing court should articulate on the record its reasons for restricting parole eligibility); *Juneby v. State*, 641 P.2d 823, 846 (Alaska App. 1982) (explaining the findings that must be made regarding aggravating and mitigating factors for presumptive sentencing), *modified on reh'g*, 665 P.2d 30 (Alaska App. 1983); *Frankson v. State*, 518 P.3d 743, 757 (Alaska App. 2022) (holding that a court should put on the record its reasons for rejecting a plea agreement); AS 12.55.025(a)(2) (requiring sentencing courts to include in the record "findings on material issues of fact and on factual questions required to be determined as a prerequisite to the selection of the sentence imposed").

[150] Former Alaska Const. art. I, § 12 (pre-1994).

[151] *Chaney*, 477 P.2d at 444.

Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a noncriminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves.[152]

The *Chaney* criteria were subsequently codified in AS 12.55.005.[153]

Sentencing courts are constitutionally required to consider the *Chaney* criteria when sentencing a criminal defendant under Alaska law.[154] This does not mean that trial courts must necessarily recite the sentencing goals by rote; but it does mean that the trial court's remarks and the record as a whole must clearly demonstrate that the

---

[152] *Id.*

[153] In 2000, AS 12.55.005 was amended to include "restoration of the victim and the community" to the list of sentencing factors that trial courts are required to consider when sentencing a criminal defendant under Alaska law. SLA 2000, ch. 103, § 1. Article I, Section 12 of the Alaska Constitution has similarly been amended to include the rights of victims and the right to restitution, as well as to codify the goal of community condemnation that the supreme court identified in *Chaney*. The provision now states, in pertinent part:

> Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation.

[154] *See, e.g.*, *Chaney*, 477 P.2d at 444; *Asitonia*, 508 P.2d at 1025; *Perrin*, 543 P.2d at 418; *Houston*, 648 P.2d at 1027.

*Chaney* criteria have been properly considered.[155]  Indeed, in cases where the on-the-record sentencing explanation is inadequate or incomplete, the appellate courts have not hesitated to remand the case for further explanation and/or resentencing.[156]

Thus, Alaska has a strong tradition of requiring on-the-record sentencing explanations to ensure that sentences are imposed constitutionally and in accordance with Alaska law.  Given this tradition and history, we conclude that a similar requirement should apply in cases where a juvenile offender is sentenced to life without parole (or its functional equivalent).  That is, we conclude that, although a sentencing court need not recite the *Miller* factors by rote before sentencing a juvenile to the functional equivalent of a life without parole sentence, the sentencing court's remarks, and the record as a whole, must clearly show that the court has properly considered the defendant's youth

---

[155] *Evans v. State*, 574 P.2d 24, 26 (Alaska 1978) ("The trial court need not recite the goals of sentencing as long as it is clear that it has considered those goals.").

[156] *See, e.g.*, *State v. Bumpus*, 820 P.2d 298, 304 (Alaska 1991) ("The court of appeals correctly identified several shortcomings in Judge Ripley's assessment of a twenty-three year sentence . . . .  Based on these shortcomings, the court of appeals had considerable basis for concluding, as it did, that the record before it did not support the sentence imposed by Judge Ripley."); *Brown v. State*, 693 P.2d 324, 330 (Alaska App. 1984) ("Given the lack of an appropriate sentencing explanation, we are unable to provide effective appellate review of the sentences.  Accordingly, a remand will be necessary to permit the sentencing court to explain Brown's sentence more fully."); *Soroka v. State*, 598 P.2d 69, 71-72 (Alaska 1979) ("The judge . . . did not discuss the nature of the original offense or the criteria to be considered in sentencing set forth in *State v. Chaney* . . . .  The record before us is inadequate to determine whether the judge was clearly mistaken in imposing the sentence, and we accordingly remand for resentencing." (citations omitted)); *Andrews v. State*, 552 P.2d 150, 154 (Alaska 1976) ("[W]hat is lacking here is the 'thorough [sentence] explanation' called for by *Perrin*.  Absent such an explanation we are unable to advance the objectives of sentence review which were articulated in *Chaney*."); *see also King v. State*, 487 P.3d 242, 250-52 (Alaska App. 2021) (remanding when there was insufficient consideration of referral to the three-judge sentencing panel based on manifest injustice).

and the attendant characteristics of youth and has determined (explicitly or implicitly) that the juvenile qualifies as one of those "rare" juveniles "whose crime reflects irreparable corruption" and who can therefore be lawfully sentenced to life without parole.[157]

We note that Alaska law already requires sentencing judges to carefully consider a youthful offender's age and potential for rehabilitation. In *Riley v. State*, this Court held that it was "particularly important in first-degree murder cases involving youthful first offenders that rehabilitation and individual deterrence . . . be accorded careful scrutiny and appropriate weight."[158] We have since cited *Riley* for the principle that courts must affirmatively consider a person's youth at sentencing, and we have remanded cases for resentencing in situations where the record was not clear that the defendant's youth had been properly considered.[159] Our holding today — that the Alaska

---

[157] *Miller v. Alabama*, 567 U.S. 460, 479-80 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005) and *Graham v. Florida*, 560 U.S. 48, 68 (2010)).

[158] *Riley v. State*, 720 P.2d 951, 953 (Alaska App. 1986).

[159] *See, e.g.*, *Gray v. State*, 267 P.3d 667, 675 (Alaska App. 2011) (reviewing sentence to determine if trial court gave juvenile offender's prospects for rehabilitation "careful scrutiny and appropriate weight"); *Waterman v. State*, 342 P.3d 1261, 1270 (Alaska App. 2015) (acknowledging relevance of a defendant's youth to issues relating to their degree of blameworthiness and their prospects for rehabilitation); *see also Nelson v. State*, 2021 WL 2134979, at *5 (Alaska App. May 26, 2021) (unpublished) ("In crafting individualized sentences for youthful offenders, trial courts must place particular emphasis on the offender's age and related characteristics, including their transient immaturity and potential for rehabilitation"); *Walker v. State*, 2017 WL 3126747, at *2-3 (Alaska App. July 19, 2017) (unpublished); *Chamberlain v. State*, 2014 WL 5307844, at *3 (Alaska App. Oct. 15, 2014) (unpublished); *Gonzales v. State*, 2014 WL 4176179, at *13 (Alaska App. Aug. 20, 2014) (unpublished); *Rose v. State*, 2001 WL 274729, at *2 (Alaska App. Mar. 21, 2001) (unpublished); *Stephan v. State*, 1995 WL 17220333, at *2 (Alaska App. Feb. 15, 1995) (unpublished); *State v. Richards*, 720 P.2d 47, 49 (Alaska App. 1986).

Constitution requires consideration of the *Miller* factors and an on-the-record sentencing explanation before a life without parole sentence (or its functional equivalent) can be lawfully imposed on a juvenile offender — is therefore simply an extension of long-established sentencing principles and procedures under Alaska law.

*Why we conclude that the constitutional principles underlying* Miller *apply equally to sentences that are the functional equivalent of life without parole*

In the previous section, we used the concepts of "a life without parole sentence" and "the functional equivalent of a life without parole sentence" interchangeably. We did so because we agree with the vast majority of state courts that have held that the constitutional principles underlying *Miller* apply equally to sentences that are the functional equivalent of a life without parole sentence.[160]

The more difficult question, in our view, is how to define when a sentence qualifies as the functional equivalent of a life without parole sentence. To answer this question, we turn first to *Graham*, which held that juveniles convicted of non-homicide crimes may not receive a life without parole sentence because such a sentence would

---

[160] *See People v. Holman*, 91 N.E.3d 849, 861 (Ill. 2017) ("The greater weight of authority has concluded that *Miller* and *Montgomery* send an unequivocal message: Life sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment unless the trial court considers youth and its attendant characteristics."); *Carter v. State*, 192 A.3d 695, 725 (Md. App. 2018) ("The initial question is whether a sentence stated as a term of years for a juvenile offender can ever be regarded as a sentence of life without parole for purposes of the Eighth Amendment. It seems a matter of common sense that the answer must be 'yes.'"); *Steilman v. Michael*, 407 P.3d 313, 319-20 (Mont. 2017) ("Logically, the requirement to consider how 'children are different' cannot be limited to de jure life sentences when a lengthy sentence denominated in a number of years will effectively result in the juvenile offender's imprisonment for life."); *State v. Ramos*, 387 P.3d 650, 659 (Wash. 2017) ("We now join the majority of jurisdictions that have considered the question and hold that *Miller* does apply to juvenile homicide offenders facing de facto life-without-parole sentences.").

violate the Eighth Amendment's prohibition against cruel and unusual punishment.[161]
The *Graham* decision made clear that states are not required to guarantee eventual
release to juvenile non-homicide offenders, but that states must give these juveniles
"some meaningful opportunity to obtain release based on demonstrated maturity and
rehabilitation."[162]

Therefore, a sentence that does *not* provide a "meaningful opportunity to
obtain release based on demonstrated maturity and rehabilitation" qualifies as a *de facto*
life without parole sentence for purposes of *Graham.* Moreover, the same definition
should apply under *Miller*, which expressly held that there was nothing about *Graham*'s
reasoning that was "crime-specific."[163] Thus, under *Miller*, a sentence that does not
provide a "meaningful opportunity to obtain release based on demonstrated maturity and
rehabilitation" is unconstitutional when imposed on a juvenile offender convicted of
homicide whose crime reflects "unfortunate yet transient immaturity" rather than
"irreparable corruption."[164]

However, neither *Graham* nor *Miller* defined what qualifies as a
"meaningful opportunity to obtain release based on demonstrated maturity and
rehabilitation." In *Graham*, the Court equated the term "meaningful" with the term

---

[161] *Graham*, 560 U.S. at 74.

[162] *Id.* at 75.

[163] *Miller v. Alabama*, 567 U.S. 460, 473 (2012).

[164] *Id.* at 479-80 (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005) and *Graham*, 560 U.S. at 68); *see also Jones v. Mississippi*, 141 S. Ct. 1307, 1315 n.2 (2021) ("That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." (quoting *Montgomery v. Louisiana*, 577 U.S. 190, 211 (2016))).

"realistic," but otherwise left it to the individual states "to explore the means and mechanisms" for complying with *Graham*'s constitutional mandate.[165] The *Miller* Court likewise did not provide a clear definition of what constitutes a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." But in *Montgomery*, the Court suggested that states could fix what otherwise qualified as an illegal life without parole sentence "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."[166] As a result, many state courts define a functional life without parole sentence in relation to the number of years a juvenile offender must serve before becoming eligible for parole. (Some state courts have questioned, however, whether their discretionary parole systems actually provide juvenile offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," as we discuss in the next section.[167])

Initially, some state courts looked to life expectancy tables to define what type of sentence qualifies as a functional life without parole sentence for purposes of *Miller*. Under this approach, a sentence qualifies as the functional equivalent of a life without parole sentence when the date that the juvenile offender becomes eligible for parole (or the date the offender will be released if there is no parole eligibility) exceeds

---

[165] *Graham*, 560 U.S. at 75, 82.

[166] *Montgomery*, 577 U.S. at 212.

[167] *See Diatchenko v. Dist. Att'y for Suffolk Dist.* (*Diatchenko II*), 27 N.E.3d 349, 356-68 (Mass. 2015); *State v. Thomas*, 269 A.3d 487, 504 (N.J. App. Div. 2002); *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 772 (Iowa 2019); *Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397, 400 (N.Y. App. Div. 2016).

or comes near to the offender's life expectancy as measured by generic life expectancy actuarial tables.[168]

But this approach has been heavily criticized.[169] As various courts have noted, gender and racial disparities can affect projected life expectancies, and this can lead to disparate sentencing based on the offender's race or gender — an outcome that

---

[168] *See, e.g.*, *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (concluding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment"); *State v. Moore*, 76 N.E.3d 1127, 1133-34, 1139-40 (Ohio 2016) (concluding that a 77-year prison term was a *de facto* life sentence because at the time of sentencing it exceeded the life expectancy for the average juvenile black male); *see also United States v. Mathurin*, 868 F.3d 921, 932-36 (11th Cir. 2017) (discussing actuarial tables as benchmarks for *de facto* life sentences); *State v. Smith*, 892 N.W.2d 52, 64-66 (Neb. 2017) (concluding that a sentence that allowed for parole at sixty-two years old, or almost seventeen years earlier than the average life expectancy for someone the defendant's age, was constitutional); *State v. Diaz*, 887 N.W.2d 751, 768 (S.D. 2016) (concluding that an 80-year sentence was not a *de facto* life without parole sentence because the defendant would be eligible for parole after 40 years served, at which time she would be fifty-five years old).

[169] *See, e.g.*, *People v. Contreras*, 411 P.3d 445, 449 (Cal. 2018) (concluding that the "actuarial approach gives rise to a tangle of legal and empirical difficulties"); *Carter v. State*, 192 A.3d 695, 727 Md. 2018) ("Some courts have pointed out that [life expectancy] can be a difficult benchmark to apply fairly, given demographic differences in individual life expectancy."); *State v. Zuber*, 152 A.3d 197, 214 (N.J. 2017) ("Judges . . . should not resort to general life-expectancy tables when they determine the overall length of a sentence. Those tables rest on informed estimates, not firm dates, and the use of factors like race, gender, and income could raise constitutional issues."); *see also* Adele Cummings & Stacie Nelson Colling, *There Is No Meaningful Opportunity in Meaningless Data: Why it is Unconstitutional to Use Life Expectancy Tables in Post-Graham Sentences*, 18 U.C. Davis J. Juv. L. & Pol'y 267 (2014) (criticizing reliance on life expectancy tables in sentencing juveniles).

would raise significant constitutional concerns.[170] The accuracy of life expectancy tables when applied to incarcerated juvenile offenders has also been questioned. Numerous studies have indicated that incarcerated juveniles have a shorter life expectancy than non-incarcerated juveniles of the same race and gender, with some studies showing an average life expectancy of only fifty years for some juvenile prisoners.[171]

Moreover, the problem with using life expectancy tables is not solved by trying to adapt the tables to the offender's specific characteristics. As the California Supreme Court noted in *People v. Contreras*,

> [E]ven if there were a legally and empirically sound approach to estimating life expectancy, it must be noted that a life expectancy is an average. In a normal distribution, about half

[170] *See, e.g.*, *Contreras*, 411 P.3d at 449-50 (noting that life expectancy depends on constitutionally suspect classifications such as race and gender, as well as "variables that have long been studied by social scientists but are not included in U.S. Census or vital statistics reports — income, education, region, type of community, access to regular health care, and the like" (citations omitted)); *Carter*, 192 A.3d at 727-28; *Zuber*, 152 A.3d at 214.

[171] *See, e.g.*, ACLU of Michigan Juvenile Life Without Parole Initiative, *Michigan Life Expectancy Data for Youth Serving Natural Life Sentences*, http://www.lb7.uscourts.gov/documents/17-12441.pdf (concluding that Michigan juveniles sentenced to natural life sentences have average life expectancy of 50.6 years); Nick Straley, *Miller's Promise: Re-Evaluating Extreme Criminal Sentences for Children*, 89 Wash. L. Rev. 963, 986 n.142 (2014) (stating that data from New York suggests "[a] person suffers a two-year decline in life expectancy for every year locked away in prison"); *see also United States v. Taveras*, 436 F. Supp. 2d 493, 500 (E.D.N.Y. 2006) ("Life expectancy within federal prison is considerably shortened."), *vacated in part on other grounds sub nom United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008); *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (acknowledging that "long-term incarceration presents health and safety risks that tend to decrease life expectancy as compared to the general population"); *People v. J.I.A.*, 2013 WL 342653, at *5 (Cal. App. Jan. 30, 2013) (unpublished) (determining it is reasonable to conclude that a prisoner's life expectancy is considerably shorter than indicated on standard mortality tables); *Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1046 (Conn. 2015) (compiling sources).

of a population reaches or exceeds its life expectancy, while the other half does not. . . . An opportunity to obtain release does not seem "meaningful" or "realistic" within the meaning of *Graham* if the chance of living long enough to make use of that opportunity is roughly the same as a coin toss.[172]

For all of these reasons, many courts have eschewed the use of life expectancy tables in this context, concluding that the determination of whether the principles of *Miller* or *Graham* apply in a given case should not "turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates."[173]

Instead, some courts have interpreted the "meaningful opportunity to obtain release" language in *Graham* to mean that the release itself must be "meaningful" in terms of the remaining quality of the juvenile's life.[174] As the California Supreme Court noted in *Contreras*, "the language of *Graham* suggests that the high court envisioned

---

[172] *Contreras*, 411 P.3d at 451 ("Of course, there can be no guarantee that every juvenile offender who suffers a lengthy sentence will live until his or her parole eligibility date. But we do not believe the outer boundary of a lawful sentence can be fixed by a concept that *by definition* would not afford a realistic opportunity for release to a substantial fraction of juvenile offenders.").

[173] *Null*, 836 N.W.2d at 71; *Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. 2014) (quoting *Null*, 836 N.W. 2d at 71); *Contreras*, 411 P.3d at 451 (same); *Zuber*, 152 A.3d at 214 (same).

[174] *Graham v. Florida*, 560 U.S. 48, 75 (2010); *see also Montgomery v. Louisiana*, 577 U.S. 190, 213 (2016) (holding that juvenile homicide offenders serving life without parole sentences like Montgomery "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored"); *Casiano*, 115 A.3d at 1047 ("The United States Supreme Court . . . implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to . . . have any meaningful life outside of prison." (citing *Graham*, 560 U.S. at 75)). *But see State v. Charles*, 892 N.W.2d 915, 920-21 (S.D. 2017) (interpreting a "meaningful opportunity" to mean a "realistic" opportunity).

more than the mere act of release or a de minimus quantum of time outside of prison. *Graham* spoke of the chance to rejoin society in qualitative terms."[175] The Ohio Supreme Court similarly stated that "it is clear that the court intended more than to simply allow juveniles-turned-nonagenarians the opportunity to breathe their last breaths as free people. The intent was not to eventually allow juvenile offenders the opportunity to leave prison in order to die but to live part of their lives in society."[176] Other state courts have likewise agreed that a "meaningful opportunity to obtain release" must mean more than simply the prospect of a "geriatric release."[177]

As part of this approach, two state courts looked to the United States Sentencing Commission's designation of 470 months (39.17 years) as a "life sentence" to create their thresholds. In *Bear Cloud v. State*, the Wyoming Supreme Court cited the Commission's designation and then held that the defendant's aggregate sentence which made him parole eligible after serving 45 years constituted a *de facto* life without parole

---

[175] *Contreras*, 411 P.3d at 454.

[176] *State v. Moore*, 76 N.E.3d 1127, 1137 (Ohio 2016).

[177] *See, e.g.*, *Null*, 836 N.W.2d at 71 ("The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*, 560 U.S. at [75]."); *Bear Cloud*, 334 P.3d at 142 (quoting *Null*, 836 N.W.2d at 71); *People v. Buffer*, 137 N.E.3d 763, 772 (Ill. 2019) ("Practically, and ultimately, the prospect of geriatric release does not provide a juvenile with a meaningful opportunity to demonstrate the maturity and rehabilitation required to obtain release and reenter society."); *see also State v. Kelliher*, 873 S.E.2d 366, 388 (N.C. 2022) ("A genuine opportunity requires both some meaningful amount of time to demonstrate maturity while the juvenile offender is incarcerated and some meaningful amount of time to establish a life outside of prison should he or she be released."); *State v. Haag*, 495 P.3d 241, 250 (Wash. 2021) (concluding that "[a] sentence of 46 years to life amounts to a de facto life sentence for a juvenile offender because it leaves the incarcerated individual without a meaningful life outside of prison").

sentence.[178] The North Carolina Supreme Court also considered this designation, as well as employment data, in holding, under its state constitution, that "any sentence or sentences which, individually or collectively, require a juvenile to serve more than forty years in prison before becoming eligible for parole is a de facto sentence of life without parole."[179]

Lastly, some courts have looked to legislative enactments for guidance. In *People v. Buffer*, for example, the Illinois Supreme Court relied on post-*Miller* legislation enacted in Illinois to set the threshold at 40 years.[180] Likewise, in *Comer*, the New Jersey Supreme Court based its 20-year second-look period, in part, on juvenile sentencing statutes in New Jersey.[181]

Most recently, in *State v. Booker*, the Tennessee Supreme Court held that *Miller* applied to a mandatory sentence of 60 years with parole eligibility after serving 51 years.[182] Surveying legislative enactments across the country, the court concluded that "Tennessee is a clear outlier in its sentencing of juvenile homicide offenders," because the vast majority of jurisdictions (thirty-six states) allow juvenile offenders to

---

[178] *Bear Cloud*, 334 P.3d at 136, 142 (citing U.S. Sentencing Commission Preliminary Quarterly Data Report (through March 31, 2014), at 8). Bear Cloud may have been eligible for release after serving 35 years if awarded "good time" credits, but the Wyoming Supreme Court noted that such credits could be revoked and should not be considered when analyzing his sentence. *Id.* at 136 n.3.

[179] *Kelliher*, 873 S.E.2d at 388-89 (citing U.S. Sentencing Commission, *Life Sentences in the Federal System* (2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf).

[180] *Buffer*, 137 N.E.3d at 772-74.

[181] *State v. Comer*, 266 A.3d 374, 404 (N.J. 2022).

[182] *State v. Booker*, 656 S.W.3d 49, 52-53 (Tenn. 2022).

be parole eligible after serving, at most, 35 years.[183] The court concluded that the remedy for this constitutional violation was to apply the parole statute that had previously applied to defendants convicted of first-degree murder, which provided for parole eligibility after serving between 25 and 36 years.[184]

With these different approaches in mind, we now turn to the question of whether Fletcher's sentence qualifies as a *de facto* life without parole sentence — that is, whether her sentence qualifies as the type of sentence that can only be lawfully imposed on a "irreparabl[y] corrupt[]" juvenile offender after proper consideration of the offender's youth and its attendant characteristics.

*Why we conclude that Fletcher's sentence qualifies as a <u>de facto</u> life without parole sentence*

As previously explained, Fletcher received a sentence of 135 years to serve, with normal eligibility for discretionary parole.[185] This means that Fletcher will be

---

[183] *Id.* at 61-63.

[184] *Id.* at 66.

[185] Prior to 2019, "normal eligibility for discretionary parole" for defendants convicted of first-degree murder meant that the defendant had to serve one-third of their sentence before becoming eligible to be considered for discretionary parole. *See* former AS 33.15.080 (1985); former AS 33.16.090(b)(1) (pre-July 2019). The same defendants were eligible for automatic release on mandatory parole after they had served two-thirds of their sentence (assuming no loss of good-time credits). *See* AS 33.20.030; former AS 33.20.010 (1985); former AS 33.20.010(a) (pre-July 2019).

In 2019, the legislature eliminated mandatory parole for defendants convicted of first- and second-degree murder and increased the amount of time such defendants must serve before becoming eligible to be considered for discretionary parole. FSSLA 2019, ch. 4, §§ 104, 107, 118. Currently, a defendant convicted of first-degree murder committed on or after July 9, 2019 is ineligible for mandatory parole and must serve two-thirds of their sentence

(continued...)

eligible for discretionary parole after serving 45 years, when she is approximately sixty years old.[186] However, Fletcher will not be eligible for mandatory parole until she has served 90 years, at which point she will be nearly 105 years old.[187] If Fletcher serves every day of her sentence and is not released on parole, she would be nearly 150 years old at the time of her release.

In its order dismissing Fletcher's second post-conviction relief application, the superior court ruled that Fletcher's sentence — 135 years to serve (with normal eligibility for parole) — was not a *de facto* life sentence for purposes of *Miller* and its progeny because Fletcher would be eligible to be considered for discretionary parole release at the age of sixty.

On appeal, Fletcher argues that her sentence should be considered a *de facto* life without parole sentence because there is little reason to believe that the parole board would release her on discretionary parole at her first parole hearing, regardless of her demonstrated maturity and rehabilitation. Indeed, Fletcher argues that her eligibility for discretionary parole should not be considered at all when assessing whether her sentence qualifies as a *de facto* life sentence because (according to Fletcher) Alaska's current system for discretionary parole does not provide a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" for juvenile offenders convicted of homicide.

This argument deserves serious consideration. In *Jackson v. State*, the Alaska Supreme Court held that a sentencing court should not consider a defendant's

---

[185] (...continued)
before they are eligible to be considered for release on discretionary parole. *See* AS 33.16.010(g); AS 33.16.090(b)(1)(A); AS 33.20.010(a)(4).

[186] *See* former AS 33.15.080 (1985).

[187] *See* former AS 33.20.010 (1985).

eligibility for parole when deciding the proper length of a defendant's sentence.[188] The court reasoned that "the assumption that an offender will be paroled on a particular date is, at best, speculative," and "if a sentence were adjusted to reflect such an assumption, but the offender not released as 'scheduled,' the full service of a clearly excessive sentence might result."[189] *Jackson* therefore mandates that "the correct approach is for the sentencing judge to impose an appropriate term of incarceration, considering the *Chaney* criteria, on the assumption that the entire term may be served."[190] Subsequent cases have reaffirmed the *Jackson* holding, and further confirmed that discretionary parole is very difficult for adult offenders to obtain, particularly offenders convicted of violent crimes.[191]

Given the concern expressed in *Jackson* that considering a defendant's eligibility for discretionary parole may lead to an excessive sentence under *Chaney* because release on discretionary parole is too speculative, there is a similar concern that considering a juvenile offender's eligibility for discretionary parole may lead to an

---

[188]  *Jackson v. State*, 616 P.2d 23, 25 (Alaska 1980).

[189]  *Id.* at 24-25.

[190]  *Id.* at 25 (citations omitted).

[191]  *Thomas v. State*, 413 P.3d 1207, 1212 (Alaska App. 2018) (explaining that "eligibility to be considered for discretionary parole does not mean that the defendant will be granted discretionary parole at that point in time, or at any later point in time"); *see also Ferguson v. State*, 242 P.3d 1042, 1054 (Alaska App. 2010) (finding defense attorney ineffective for optimistically misrepresenting chances of the defendant's release on discretionary parole given that it was undisputed that there was "not a snowball's chance in hell" of the defendant obtaining release in light of the seriousness of the offense and the defendant's criminal history); *Galvan v. State*, 2000 WL 1350597, at *4-5 (Alaska App. Sept. 20, 2000) (unpublished) (upholding a judicial finding that "the Alaska Parole Board almost never grants discretionary parole to violent offenders").

unconstitutionally lengthy sentence for a juvenile offender who may nevertheless die in prison despite their demonstrated maturity and rehabilitation.[192]

In recognition of similar concerns, a number of state legislatures have instituted changes to their discretionary parole systems as they apply to juvenile offenders to ensure that the parole procedures provide the constitutionally-mandated "meaningful opportunity to obtain release" that *Graham* and *Miller* require. In addition to setting universal parole eligibility dates for juvenile offenders, these jurisdictions have adopted special procedures for juvenile offenders and have modified their statutory requirements so that they focus more on the mitigating aspects of a defendant's youth and less on the overall seriousness of the crime.[193]

For example, West Virginia has enacted a statute that directs the parole board to provide juveniles with a "meaningful opportunity to obtain release" and requires the parole board to consider "the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased

---

[192] *See Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015) ("[A]lthough *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a 'mere hope' of parole; it creates a categorical entitlement to 'demonstrate maturity and reform,' to show that 'he is fit to rejoin society,' and to have a 'meaningful opportunity for release.'"); *Md. Restorative Justice Initiative v. Hogan*, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017) (unpublished) ("It is difficult to reconcile the Supreme Court's insistence that juvenile offenders with life sentences must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' if the precept does not apply to the parole proceedings that govern the opportunity for release." (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010))).

[193] *See, e.g.*, Ark. Code § 16-93-621(b); Cal. Penal Code § 4801(c); Conn. Gen. Stat. § 54-125a(f)(3)-(5); 730 Ill. Comp. Stat. 5/5-4.5-115(j); Or. Rev. Stat. § 144.397(3)-(12); W. Va. Code § 62-12-13b.

maturity of the prisoner during incarceration."[194]  Oregon law requires its parole board to "provide the [juvenile offender] a meaningful opportunity to be released on parole" and to "give substantial weight to the fact that a person under 18 years of age is incapable of the same reasoning and impulse control as an adult and the diminished culpability of minors as compared to that of adults."[195]  Likewise, Arkansas requires its parole board to "take[] into account how a minor offender is different from an adult offender" and to consider factors including the juvenile offender's "age" and "immaturity" at the time of the offense, "any history of abuse [or] trauma," and "[t]he extent of the [juvenile offender's] role in the offense and whether and to what extent an adult was involved in the offense."[196]

Some of these legislative reforms have also included additional procedural protections for juvenile offenders in the parole process.  For example, Connecticut, Illinois, and Oregon require that counsel be appointed for all indigent juvenile offenders for their parole hearings.[197]  Other states like California and Colorado created comprehensive programs for young offenders that allow earlier possibilities for release than their underlying parole programs.[198]

---

[194]  W. Va. Code § 62-12-13b.

[195]  Or. Rev. Stat. § 144.397(3), (5).

[196]  Ark. Code  § 16-93-621(b).

[197]  *See* Conn. Gen. Stat. § 54-125a(f)(3); 730 Ill. Comp. Stat. 5/5-4.5-115(e); Or. Rev. Stat. § 144.397(12).

[198]  *See* Cal. Penal Code § 3051 (establishing special "youth offender parole hearings" for prisoners who were under the ages of twenty-five and eighteen, respectively, at the time of their offenses); Colo. Rev. Stat.  § 17-34-102 (directing the Colorado department of corrections to develop a "specialized program" for juvenile offenders).

Some state courts have imposed similar procedural protections for juvenile offenders. In *Diatchenko II*, for example, the Massachusetts Supreme Judicial Court found its state parole system unconstitutionally defective in providing juvenile offenders a meaningful opportunity for release.[199] The court therefore granted juvenile offenders funds for counsel and expert witnesses as well as judicial review of the parole board's decisions to ensure the board was properly considering the *Miller* factors in its decisions.[200]

In addition, deficiencies in state parole systems have led some state courts to discount the significance of early parole eligibility dates when determining what type of sentence qualifies as a *de facto* life without parole sentence under *Miller*. In *State v. Thomas*, for example, a New Jersey appellate court held that a juvenile offender's sentence "evolved into" the functional equivalent of a life without parole sentence after the parole board repeatedly denied the offender's application for discretionary parole.[201] The defendant in *Thomas* committed two murders when he was seventeen years old and was originally sentenced to a life sentence with the possibility of parole after 13 years.[202]

---

[199] *Diatchenko v. Dist. Att'y for Suffolk Dist.* (*Diatchenko II*), 27 N.E.3d 349, 353 (Mass. 2015).

[200] *Id.* at 365-67; *see also Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397, 400 (N.Y. App. Div. 2016) ("For those persons convicted of crimes committed as juveniles who, but for a favorable parole determination will be punished by life in prison, the Board must consider youth and its attendant characteristics in relationship to the commission of the crime at issue." (citations omitted)).

[201] *State v. Thomas*, 269 A.3d 487, 508 (N.J. App. Div. 2022).

[202] *Id.* at 490-91.

The defendant subsequently applied for discretionary parole seven different times, and was rejected each time despite his demonstrated maturity and rehabilitation.[203] Then fifty-eight years old, and having served over 40 years of his sentence, the defendant filed a motion to correct an unconstitutional sentence, arguing that his sentence was the functional equivalent of a life without parole sentence because the New Jersey Parole Board's procedures did not provide him a "meaningful opportunity to obtain release" as mandated by *Miller*.[204] The New Jersey court agreed, concluding that the parole hearings "fall far short of providing an adversarial hearing for defendant to demonstrate the degree of maturity and rehabilitation he has achieved while incarcerated."[205] The court noted that the defendant was not represented by counsel at his parole hearings and was not permitted to present witnesses or expert testimony.[206]

Concluding that the defendant's constitutional rights were "not satisfied by periodic parole hearings, which do not consider the *Miller* factors and do not provide a constitutionally sufficient procedure and forum to adjudicate the important Federal and State constitutional issues presented," the New Jersey court held that the defendant's sentence had "evolved into" the practical equivalent of a life without parole sentence, and the defendant was therefore entitled to the resentencing remedy for *Miller* violations adopted by the New Jersey Supreme Court in *Comer*.[207] Under this remedy, the

---

[203] *Id.* at 491, 504.

[204] *Id.* at 493-94.

[205] *Id.* at 504.

[206] *Id.*

[207] *Id.* at 506, 508-09; *see State v. Comer*, 266 A.3d 374, 399-400 (N.J. 2022) (requiring that juveniles sentenced to life without the possibility for parole receive an adversarial resentencing hearing after serving 20 years in prison).

defendant was entitled to a resentencing hearing in which the court would consider the *Miller* factors and the defendant would be represented by counsel and have the right to introduce expert testimony and evidence of his maturity and rehabilitation.[208]

When viewed against the backdrop of these various legislative reforms and state court decisions, it is not clear that Alaska's current system of discretionary parole provides juvenile offenders such as Fletcher a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Unlike some other jurisdictions, there have been no legislative reforms to the Alaska parole statutes in response to *Miller*. There is therefore nothing in the current statutes that requires the Alaska Parole Board to treat defendants who committed their crimes when they were juveniles any differently than defendants who committed their crimes when they were adults. Nor is there anything that requires the parole board to evaluate the *Miller* factors or to take the differences between children and adults into account when evaluating whether to release a defendant on discretionary parole. And there are no provisions in the statutes for ensuring indigent juvenile offenders have access to counsel.

There are also potential problems with Alaska's statutory criteria for discretionary parole when applied to juvenile offenders tried as adults. Under AS 33.16.100(a), the parole board is authorized to grant a defendant discretionary parole if it determines that a reasonable probability exists that (1) "the prisoner will live and remain at liberty without violating any laws or conditions imposed by the board"; (2) "the prisoner's rehabilitation and reintegration into society will be furthered by release on parole"; (3) "the prisoner will not pose a threat of harm to the public if released on parole"; and (4) "release of the prisoner on parole would not diminish the seriousness of the crime."

---

[208] *Thomas*, 269 A.3d at 509.

But as other courts have recognized, there are constitutional concerns with a parole system that can deny a juvenile offender release on discretionary parole based solely on the seriousness of the crime. As the Iowa Supreme Court explained in *Bonilla v. Iowa Board of Parole*:

> [T]he focus of the decision whether to release a juvenile offender on parole under *Graham-Miller* cannot be the heinousness of the underlying offense. . . . [F]rom the beginning of the development of its recent application of cruel and unusual punishment concepts to juveniles, the Supreme Court has emphasized that "[a]n unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth." As emphasized by Justice Kennedy in plain language, "[C]hildren who commit even heinous crimes are capable of change." Thus, even in cases where the juvenile offender has been waived into adult court because of the seriousness of the underlying crime, most offenders are redeemable. Instead of focusing on the underlying crime, parole authorities must focus on the dynamic factors of the development of youth and the high likelihood of maturity and rehabilitation.[209]

We recognize that, while there is nothing requiring the Alaska Parole Board to treat juvenile offenders differently, there is also nothing preventing the parole board from applying the *Miller* factors and de-emphasizing the seriousness of the offense in cases involving juvenile offenders. Indeed, in *Bonilla*, the Iowa Supreme Court upheld Iowa's parole system as facially constitutional partly because the parole board reassured

[209] *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 772 (Iowa 2019) (third and fourth alterations in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005) and *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016)) (other citations omitted)); *see also Hawkins v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397, 400 (N.Y. App. Div. 2016).

the court that the primary focus of discretionary parole hearings involving juvenile offenders would be their maturity and rehabilitation rather than the heinousness of their crimes.[210]

Here, the record does not contain such reassurances from the Alaska Parole Board. But this is, in large part, because of the procedural posture of this case. Fletcher's post-conviction relief application was dismissed on the pleadings before the State was required to file a response to her constitutional claims. Moreover, unlike the defendant in the New Jersey case, Fletcher has yet to go through the discretionary parole process, and there is no factual record from which to judge the constitutionality of the parole board's policies and procedures when applied to juvenile offenders.

Possible solutions to this problem would be to remand this case for further litigation on this issue or to delay any resolution of Fletcher's case until she has gone through at least one discretionary parole hearing.[211] However, we conclude that we need not solve this problem here because we also conclude that Fletcher's 135-year sentence qualifies as a *de facto* life without parole sentence, even accounting for her eligibility for parole after serving 45 years.

We conclude that a sentence that allows an opportunity for release only after 45 years is a *de facto* life without parole sentence based primarily on the changing landscape of juvenile sentencing practices post-*Miller*. In determining whether a sentence constitutes cruel and unusual punishment, we are required to exercise our independent judgment and to look at "the evolving standards of decency that mark the

---

[210] *Bonilla*, 930 N.W.2d at 772-74.

[211] We acknowledge that Fletcher's case has already been significantly delayed on appeal due, in part, to the issuance of *Jones*, which altered what many state courts had viewed as a broad federal constitutional mandate under *Miller*.

progress of a maturing society."[212]  One starting point for this analysis is "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question."[213]  As the United States Supreme Court has observed, "It is not so much the number of [changing] States that is significant, but the consistency of the direction of change."[214]

Today, as a result of post-*Miller* legislative enactments, all juvenile offenders in at least eighteen states and the District of Columbia are eligible for parole or resentencing after serving between 15 and 40 years.[215]  Indeed, within these jurisdictions, the vast majority (sixteen of eighteen) require a juvenile to serve no more than 20-30 years before becoming eligible for parole or resentencing.[216]  Significantly,

[212]  *Gray v. State*, 267 P.3d 667, 671 (Alaska App. 2011) (quoting *Abraham v. State*, 585 P.2d 526, 531 (Alaska 1978)) (discussing how to implement *Roper* and *Graham*).

[213]  *Roper*, 543 U.S. at 564; *see also Atkins v. Virginia*, 536 U.S. 304, 312 (2002) ("[T]he 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989))).

[214]  *Atkins*, 536 U.S. at 315.

[215]  *See, e.g.*, Ark. Code §§ 16-93-621, 5-4-104(b), 5-10-102(c)(2); Cal. Penal Code § 3051(b)(4); Colo. Rev. Stat. §§ 17-34-101, 18-1.3-401(4); Conn. Gen. Stat. § 54-125a(f); 11 Del. Code § 4204A(d); D.C. Code § 24-403.01(c)(2); Fla. Stat. § 921.1402(2); 730 Ill. Comp. Stat. 5/5-4.5-115; Md. Code, Crim. Proc. §§ 6-235, 8-110; Mass. Gen. Laws ch. 279, § 24; N.M. Stat. §§ 31-18-15.3, 31-21-10.2, *as amended by* 2023 N.M. Laws ch. 24, §§ 1, 3; N.D. Cent. Code § 12.1-32-13.1; Ohio Rev. Code §§ 2929.03(H), 2967.132; Or. Rev. Stat. § 144.397; Tex. Penal Code § 12.31(a), Tex. Gov't Code § 508.145; Utah Code § 76-3-209; Va. Code § 53.1-165.1; W. Va. Code § 61-11-23; Wyo. Stat. § 6-10-301.

[216]  *See, e.g.*, Ark. Code §§ 16-93-621, 5-4-104(b), 5-10-102(c)(2); Cal. Penal Code § 3051(b)(4); Conn. Gen. Stat. § 54-125a(f); 11 Del. Code § 4204A(d); D.C. Code § 24-403.01(c)(2); Fla. Stat. § 921.1402(2); Md. Code, Crim. Proc. §§ 6-235, 8-110; Mass. Gen. Laws ch. 279, § 24; N.M. Stat. §§ 31-18-15.3, 31-21-10.2, *as amended by* 2023 N.M.

(continued...)

no jurisdiction that has fixed parole eligibility for juvenile offenders has set that eligibility at more than 40 years.  Moreover, in at least nine states that still retain life without parole sentences, legislatures have defined life *with* the possibility of parole as requiring no more than 35 years before eligibility for discretionary parole or early release.[217]  Given this clear and consistent trend among state legislatures, we conclude that Fletcher's sentence, which does not provide for any consideration of discretionary parole until she serves 45 years in prison, constitutes a *de facto* life sentence for purposes of *Miller* and the Alaska Constitution.[218]

---

[216] (...continued)
Laws ch. 24, §§ 1, 3; N.D. Cent. Code § 12.1-32-13.1; Ohio Rev. Code §§ 2929.03(H), 2967.132; Or. Rev. Stat. § 144.397; Utah Code § 76-3-209; Va. Code § 53.1-165.1; W. Va. Code § 61-11-23; Wyo. Stat. § 6-10-301.  Additionally, in Colorado, juveniles have access to a special program through which they can earn parole eligibility after approximately 20 to 25 years, but will become eligible for parole after 40 years even if they do not complete the program.  Colo. Rev. Stat. §§ 17-34-101, 18-1.3-401(4).

[217] Ala. Code § 15-22-28(2); Ariz. Rev. Stat. § 13-751(A)(2); Ga. Code § 17-10-6.1(c)(1); Idaho Code § 18-4004; Ky. Rev. Stat. § 640.040(1); Minn. Stat. § 244.05(4)(b); Mont. Code § 46-23-201(4); N.C. Gen. Stat. § 15A-1340.19A; R.I. Gen. Laws § 13-8-13(e).

[218] We also note that it appears that no state supreme court that has expanded the protections of *Miller* under its state constitution has approved of a sentence that is as long as Fletcher's — *i.e.*, a sentence where the first possibility of release occurs after 45 years. *See State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) (concluding that a sentence of 50 years with parole eligibility after 35 years for a non-homicide juvenile offender was a *de facto* life sentence); *Diatchenko v. Dist. Att'y for Suffolk Dist.* (*Diatchenko I*), 1 N.E.3d 270, 286-87 (Mass. 2013) (concluding that a juvenile offender who had served 31 years of his sentence was entitled to immediate parole eligibility); *State v. Haag*, 495 P.3d 241, 250 (Wash. 2021) (en banc) (concluding that a sentence of 46 years to life for a juvenile offender was a *de facto* life sentence); *State v. Comer*, 266 A.3d 374, 399 (N.J. 2022) (providing for resentencing of juvenile offenders after 20 years); *State v. Kelliher*, 873 S.E.2d 366, 390 (N.C. 2022) (holding that sentences that require juvenile offenders to serve more than 40 years before

(continued...)

This conclusion is consistent with Alaska case law. In *Thompson v. State*, we advised sentencing courts that "[w]e do not believe that a sentence in excess of ninety-nine years can be justified except where the trial court finds that in order to protect the public the defendant must spend the rest of his life in prison without any possibility of parole."[219] We therefore required trial courts to make this finding before imposing a composite sentence in excess of 99 years.[220] Although dated, *Thompson* supports the conclusion that Fletcher's 135-year sentence (with eligibility for discretionary parole after 45 years) qualifies as a *de facto* life without parole sentence for purposes of *Miller* and the related case law.[221]

---

[218] (...continued)
becoming eligible for parole are *de facto* life sentences).

[219] *Thompson v. State*, 768 P.2d 127, 133-34 (Alaska App. 1989) (citing *Nukapigak v. State*, 663 P.2d 943 (Alaska 1983) and *Hastings v. State*, 736 P.2d 1157 (Alaska App. 1987)).

[220] *Thompson*, 768 P.2d at 134.

[221] *Cf. Walker v. State*, 2017 WL 3126747, at *1-2 (Alaska App. July 19, 2017) (unpublished) (holding that a juvenile offender's 70-year sentence did not qualify as a *de facto* life sentence for purposes of *Miller* because the defendant would be eligible for discretionary parole after serving 23 years, 4 months and would be released on mandatory parole after serving 46 years, 8 months).

*Thompson* is dated because it states that a sentence in excess of 99 years is not justifiable unless the court finds that a life without parole sentence is necessary "to protect the public." *Thompson*, 768 P.2d at 133-34. When *Thompson* was issued, this Court was describing the *Neal-Mutschler* rule as allowing active composite sentences above the maximum sentence for the most serious crime only upon a finding that this was necessary to protect the public. *See e.g.*, *Contreras v. State*, 675 P.2d 654, 657 (Alaska App. 1984), *Whitmore v. State*, 1984 WL 908549, at *3 (Alaska App. June 6, 1984) (unpublished). We have since clarified that "the *Neal-Mutschler* ceiling is simply a starting point or guide for analyzing the proper severity of a defendant's composite sentence — and that a composite sentence greater than the *Neal* ceiling can sometimes be justified by sentencing goals other than the particular goal of protecting the public." *Phelps v. State*, 236 P.3d 381, 393 (Alaska
(continued...)

Our conclusion is also consistent with sentencing practices in Alaska. In *Miller*, the United States Supreme Court opined that "occasions for sentencing juveniles to this harshest possible penalty will be uncommon" due to the "great difficulty" in distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."[222] Our review of published and unpublished Alaska appellate decisions has confirmed that most juvenile offenders convicted of homicide have received sentences under the maximum 99 years, and only a handful of juvenile

---

[221] (...continued)
App. 2010). Understood through this lens, *Thompson* stands for the principle that a sentencing court should not impose a sentence of more than 99 years for the crime of first-degree murder (with discretionary parole eligibility — which prior to 2019 was after 33 years (*see* former AS 33.16.090(b)(1) (pre-July 2019))) unless it concludes that the sentencing goals justify sentencing a defendant to spend the rest of their life in prison.

[222] *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573 and *Graham*, 560 U.S. at 68).

offenders have received a sentence over 99 years.[223] Thus, Fletcher's sentence currently stands as among the harshest penalties imposed on a juvenile offender in this state.

Lastly, our conclusion is consistent with the reasoning adopted by many state courts that a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" must mean more than just the possibility of a "geriatric release."[224] In 2016, the Alaska legislature enacted a "geriatric release" parole statute

---

[223] Our review revealed only three juvenile offenders other than Fletcher who have received a sentence above 99 years. *See Hall v. State*, 1999 WL 34000714 (Alaska App. Mar. 10, 1999) (unpublished) (159 years with parole eligibility after 53 years); *Watkinson v. State*, 980 P.2d 469, 470, 473-74 (Alaska App. 1999) (100 years with parole eligibility after 33 years, 4 months); *Gonzales v. State*, 2014 WL 4176179, at *11-13 (Alaska App. Aug. 20, 2014) (unpublished) (161 years with 50 years suspended (111 years to serve) with parole eligibility after about 34 years). *Cf. Ridgely v. State*, 739 P.2d 1299, 1301-03 (Alaska App. 1987) (reversing consecutive sentences and remanding for entry of a 99-year composite sentence with parole eligibility after 33 years); *Kasak v. State*, 1989 WL 1595081, at *4 (Alaska App. June 21, 1989) (unpublished) (70 years with parole eligibility after 23 years, 4 months); *Hightower v. State*, 842 P.2d 159 (Alaska App. 1992) (99 years with parole eligibility after 33 years); *Perotti v. State*, 843 P.2d 649 (Alaska App. 1992) (same); *Stallings v. State*, 1995 WL 17220754, at *1 (Alaska App. May 3, 1995) (unpublished) (same); *Moore v. State*, 1996 WL 499526, at *1 (Alaska App. Sept. 4, 1996) (unpublished) (three juveniles with parole eligibility after approximately 33 years; 21 years, 8 months; and 18 years, 4 months, respectively); *Reeves v. State*, 1999 WL 225900, at *1-2 (Alaska App. April 14, 1999) (unpublished) (65 years with 20 years suspended (45 years to serve) with parole eligibility after 15 years); *Ling v. State*, 2008 WL 2152028, at *1 (Alaska App. May 21, 2008) (unpublished) (99 years with parole eligibility after 33 years); *Cotting v. State*, 2008 WL 4059580, at *1 (Alaska App. Sept. 3, 2008) (unpublished) (same); *Gray v. State*, 267 P.3d 667, 669, 674 (Alaska App. 2011) (109 years with 44 years suspended (65 years to serve) with parole eligibility after 21 years, 8 months); *Walker v. State*, 2017 WL 3126747, at *1-2 (Alaska App. July 19, 2017) (unpublished) (70 years with parole eligibility after 23 years, 4 months).

[224] *See State v. Null*, 836 N.W.2d 41, 71-72 (Iowa 2013); *Bear Cloud v. State*, 334 P.3d 132, 139, 142 (Wyo. 2014); *People v. Buffer*, 137 N.E.3d 763, 769, 772 (Ill. 2019); *see also*

(continued...)

that allows defendants convicted of most crimes to be eligible for geriatric release after the age of sixty.[225] As a defendant convicted of multiple homicides, Fletcher does not qualify for release under this statute. But the parameters of the statute suggest that age sixty marks the threshold of what the legislature considers to be "geriatric release" on parole. (We also note that the fact that Fletcher will only be sixty years old after serving 45 years is itself a function of her extreme youth at the time of the crimes. A seventeen-year-old committing the same crimes would be sixty-two years old after serving 45 years.[226])

Having determined that Fletcher's sentence qualifies as a *de facto* life sentence, we now turn to the superior court's alternative grounds for denying relief to Fletcher — (1) that her original sentencing qualified as a *Miller*-compliant sentencing; and (2) that her constitutional claims were procedurally barred because she was raising them in a successive application. Lastly, we will address the question of retroactivity, which has not been previously addressed by the parties.

---

[224] (...continued)
*Montgomery v. Louisiana*, 577 U.S. 190, 213 (2016) (holding that juvenile homicide offenders serving a life without parole sentence "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored").

[225] SLA 2016, ch. 36, § 123. Defendants convicted of unclassified felonies and sexual felonies are excluded from geriatric parole eligibility. *See* AS 33.16.090(a)(2).

[226] *Cf. Miller*, 567 U.S. at 475, 477 (explaining that lengthy sentences inflict more punishment on juvenile offenders than similarly situated adult offenders because juveniles will spend a higher percentage of their natural lives in prison).

*Why we conclude that Fletcher did not receive a sentencing in which her*
*youth and its attendant characteristics were properly considered*

In its order dismissing Fletcher's second application for post-conviction relief, the superior court ruled that Fletcher was not entitled to resentencing because Fletcher had already received "the kind of individualized, case- and person-specific sentencing endorsed by the Supreme Court in *Miller*." We do not agree that Fletcher's sentencing complies with the dictates of *Miller*, as interpreted through our state constitution.

The central principle of *Miller* is that "youth matters" and "children are constitutionally different than adults for purposes of sentencing."[227] But in Fletcher's case, the prosecutor affirmatively argued at Fletcher's sentencing that, having been waived into adult court, fourteen-year-old Fletcher should be treated no differently than an adult who committed the same crimes. The sentencing judge did not voice any disagreement with the prosecutor's position, and the judge's cursory remarks at sentencing provide little reason to believe that the judge took proper account of Fletcher's youth and its attendant characteristics when he sentenced Fletcher. To the contrary, the judge appeared to treat the attributes of youth as aggravating factors, concluding that Fletcher was "very, very unlikely" to be rehabilitated because the judge did not know "what it is that [Fletcher] would be rehabilitated" from.[228]

Among the juvenile-specific factors that the judge should have considered were the fact that juveniles have a "lack of maturity and an underdeveloped sense of responsibility," that they "are more vulnerable . . . to negative influences and outside

---

[227] *Id.* at 471, 483.

[228] *Cf. Walker*, 2017 WL 3126747, at *1-2 (concluding that a juvenile offender who received 70 years (with normal eligibility for parole) had received a *Miller*-compliant hearing where his youth and its attendant characteristics were properly considered).

pressures," and that they "have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings."[229] Here, the prosecutor argued that Fletcher, not Boyd, was primarily responsible for the murders, and the prosecutor claimed that Fletcher killed the three elderly people "for the thrill of it." The sentencing judge appeared to accept the prosecutor's claim that Fletcher, who was fourteen and had essentially no criminal history, was more responsible for the murders than her nineteen-year-old boyfriend, who had already accrued a significant criminal history. The sentencing judge also gave little to no consideration to Fletcher's chaotic family environment and the evidence of neglect and abuse she endured as a child.

On appeal, the State cites to the juvenile waiver hearing, which was much more extensive than the sentencing hearing, and the State argues that the waiver judge's findings support an implicit finding of "irreparable corruption." But the juvenile waiver hearing must be distinguished from the sentencing hearing. The only question before the waiver judge was whether Fletcher was amenable to treatment in the next six years, before she reached the age of twenty. Notably, none of the expert psychiatrists who evaluated Fletcher prior to the juvenile waiver hearing opined that she was irredeemable or "irreparabl[y] corrupt[]." While four of the five experts expressed pessimism about Fletcher's rehabilitation in the short-term, each expressed the possibility that progress could occur in someone so young. Moreover, three of those experts now agree that their opinions would need to be modified in light of Boyd's recantations and the more recent developments in neuroscience that underpin the holdings of *Roper*, *Graham*, *Miller*, and *Montgomery*.

---

[229] *Miller*, 567 U.S. at 471 (alteration and omission in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).

Accordingly, we conclude that, *if* the constitutional rule adopted in this opinion is determined to be retroactive, Fletcher would be entitled to a resentencing in which the distinctive attributes of youth under *Miller* are properly considered and a determination is made regarding whether Fletcher qualifies as one of the "rare" juvenile offenders who is "irreparabl[y] corrupt[]."

*Why we conclude that Fletcher's constitutional claim is not procedurally barred*

The superior court also dismissed Fletcher's second application for post-conviction relief because it concluded that it was procedurally barred as a successive application.[230]

As an initial matter, we note that juvenile defendants in other jurisdictions have not faced the procedural obstacles Fletcher has faced. Instead, courts in other jurisdictions have generally treated a defendant's claim that their sentence is unconstitutional under *Miller* and *Montgomery* as a claim that their sentence is illegal —

---

[230] *See* AS 12.72.020(a)(6) (providing that a claim for post-conviction relief may not be brought when "a previous application for post-conviction relief has been filed").

a claim that can be brought at any time.[231]  Alaska Criminal Rule 35(a) likewise provides that "[t]he court may correct an illegal sentence at any time."[232]

But Fletcher did not argue that her sentence constitutes an illegal sentence under Criminal Rule 35(a).  Instead, she argued that due process requires that an exception be made to the statutory bar against successive post-conviction relief applications in cases where a new constitutional rule creates a constitutional infirmity in a defendant's conviction or sentence.  As Fletcher points out, and the superior court acknowledged, we have recognized such a due process exception in other circumstances where the constitutionality of a defendant's conviction or sentence was at stake.[233]

---

[231] *See, e.g.*, *State v. Pearson*, 836 N.W.2d 88, 94-95 (Iowa 2013) (reviewing the defendant's *Miller* claim as a constitutional challenge to an illegal sentence that may be brought at any time); *Carter v. State*, 192 A.3d 695, 717-18 (Md. 2018) (holding that defendants' claim that the Maryland parole system does not comply with *Miller* could be litigated as a motion to correct illegal sentence); *State v. Zuber*, 152 A.3d 197, 206 (N.J. 2017) (explaining that defendant was entitled to litigate his *Miller* claim as a motion to correct illegal sentence, which could be brought at any time, notwithstanding the fact that defendant challenged other aspects of his sentence on direct appeal and in post-conviction relief proceedings); *State ex rel. Morgan v. State*, 217 So. 3d 266, 276 (La. 2016) (dismissing the defendant's excessive sentence claims as procedurally barred but holding that the defendant's claim that his sentence was unconstitutional under *Graham* constituted an illegal sentence claim that could be filed at any time); *St. Val v. State*, 107 So. 3d 553, 554-55 (Fla. Dist. App. 2013) (holding that a claim based on *Graham* can be litigated in a motion to correct illegal sentence at any time).

[232] *See Lockuk v. State*, 153 P.3d 1012, 1018 (Alaska App. 2007) ("[T]he purpose of procedural rules like our Criminal Rule 35(a) is to confer continuing jurisdiction on a sentencing court to correct an illegal sentence, even if the claimed error was not raised at the time of sentencing or in the defendant's direct appeal.").

[233] *See Hall v. State*, 446 P.3d 373, 378-79 (Alaska App. 2019) (holding that due process required hearing a successive application brought on the basis of newly discovered evidence that was not available during previous post-conviction relief proceedings); *Grinols v. State*,

(continued...)

On appeal, the State argues that Fletcher's constitutional claim should be barred because she could have (but did not) raise any constitutional challenges to her sentence in her first application for post-conviction relief. But at the time Fletcher filed her first application for post-conviction relief, the United States Supreme Court had only decided *Roper v. Simmons*, the 2005 case that held that the death penalty was unconstitutional as applied to juveniles. The larger legal implications of this decision — and the juvenile brain research it was based on — did not become clear until the United States Supreme Court decided *Graham*, *Miller*, and *Montgomery*.[234] As this opinion has

---

[233] (...continued)
74 P.3d 889, 895 (Alaska 2003) (allowing successive applications for ineffective assistance of counsel during previous post-conviction relief proceedings); *see also Roberts v. State*, 164 P.3d 664, 666 (Alaska App. 2007) (recognizing that there might be cases where the due process clause of the Alaska Constitution would require an exception to the statutory bar against successive applications).

[234] *Cf. White v. Premo*, 443 P.3d 597, 603 (Or. 2019) (holding that defendant could not have reasonably asserted a claim under *Miller* before the decision, because the United States Supreme Court "had not yet held that juveniles typically possess traits that make them less blameworthy than adults, and certainly had not held that mandatory life-without-parole sentences for juveniles who commit homicide violate the Eighth Amendment").

Indeed, in *Smith v. State*, 258 P.3d 913, 923 (Alaska App. 2011), we declined to recognize "developmental immaturity" as a non-statutory mitigating factor for juveniles. We noted that, in 1994, the Alaska legislature enacted a statute that automatically waived sixteen- and seventeen-year-olds into adult court if they were charged with certain serious felonies. *Id.* at 922. We viewed this legislation as representing a legislative intent to treat older juveniles charged with serious felonies the same as adults with no leniency given for their youth. *Id.* at 923. We therefore concluded that recognition of a "developmental immaturity" non-statutory mitigating factor would run "contrary to this legislative policy." *Id.*

This reasoning is questionable in light of *Miller*'s pronouncement that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. As *Miller* held, "a sentencer misses too much" if they treat a child as an adult and fail to consider their "chronological age and its hallmark features — among them, immaturity,
(continued...)

explained, these cases have altered the landscape of juvenile sentencing, resulting in numerous legislative changes across various jurisdictions and multiple court decisions addressing the implications of these rulings under both state and federal constitutional law.

Accordingly, we reject the State's contention that Fletcher could have brought her state constitutional claim based on *Miller* before *Miller* was decided, and we conclude that due process requires an exception to the statutory bar against successive applications in this case.

*The retroactivity question*

The only remaining question to be decided is whether the state constitutional holding in this case is retroactive to cases like Fletcher's that are on collateral review.

In its order dismissing Fletcher's post-conviction relief, the superior court incorrectly assumed that *Miller* was not retroactive to cases on collateral review. As already explained, this assumption proved to be incorrect when the United States

---

[234] (...continued)

impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. We note that it is not actually clear that the legislature ever intended juveniles waived into adult court to be treated *exactly* like adults, but it is now clear that doing so would run afoul of the constitutional mandates of *Miller* and *Montgomery*. Accordingly, to the extent that *Smith* suggests that children can constitutionally be treated the same as adults in criminal sentencing, it is disavowed.

In *Smith*, we concluded that *Roper* and *Graham* "impose fairly narrow restrictions on a state's sentencing authority over juvenile offenders" and that they held only that states cannot sentence juvenile offenders to death or non-homicide juveniles to life without parole. *Smith*, 258 P.3d at 920. Our statements in *Smith* provide further support for our conclusion that the scale of the shift in juvenile sentencing jurisprudence that was occurring was not yet evident when Fletcher filed her first application for post-conviction relief.

Supreme Court issued *Montgomery*, in which it held that the *Miller* holding was fully retroactive under the federal constitution.[235] Thus, if Fletcher had a federal constitutional claim based on *Miller*, there would be no question that she was entitled to relief, notwithstanding the age of her case. But, as already discussed, Fletcher does not have a federal constitutional claim after *Jones* because she was not sentenced under a mandatory sentencing scheme. Instead, she has a state constitutional claim for relief — but only if the new constitutional rule articulated here (which requires the sentencing court to consider the *Miller* factors and provide an on-the-record sentencing explanation prior to sentencing a juvenile offender to a discretionary *de facto* life without parole sentence) is fully retroactive to cases on collateral review.[236]

Unlike federal law, which allows for retroactive application of a ruling on collateral review only if the new rule is substantive or is a "watershed" procedural rule that implicates the fundamental fairness of the criminal proceeding or the fundamental accuracy of the fact-finding process,[237] Alaska law determines whether a ruling is completely retroactive by applying the test set out in *Judd v. State*.[238] This three-factor test requires the court to evaluate: "(a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new

---

[235] *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016).

[236] We note that under *Charles v. State*, 326 P.3d 978, 981-86 (Alaska 2014) and *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), the new constitutional rule is automatically applied retroactively to all defendants whose convictions are not final at the time the decision is announced — *i.e.*, to all defendants who are still in the direct appeal process.

[237] *Teague v. Lane*, 489 U.S. 288, 311-15 (1989); *Charles v. State*, 287 P.3d 779, 786 (Alaska App. 2012) (per curiam).

[238] *Judd v. State*, 482 P.2d 273 (Alaska 1971).

standards."[239] As the Alaska Supreme Court has explained, the first *Judd* factor — the purpose to be served by the new rule — generally takes precedence over the other two factors, and indeed will require retroactive application of a new constitutional rule where the primary purpose of the new rule is to enhance the truth-finding function of criminal trials.[240]

We conclude that it would be premature for us to resolve the retroactivity question without additional litigation and input from the parties. Neither party addresses the question of retroactivity in their briefing — most likely because their briefs were written prior to the issuance of *Jones* when it appeared that the retroactivity ruling in *Montgomery* would govern any remedy Fletcher was entitled to under the federal constitution. Post-*Jones*, however, it is clear that Fletcher does not have a right to resentencing under the federal constitution and the retroactivity holding in *Montgomery* does not directly apply to Fletcher's case. We therefore conclude that a remand is required so that the parties may litigate whether the state constitutional rule articulated here is retroactive under the *Judd* test.

### Conclusion

For all the foregoing reasons, we AFFIRM the dismissal of Fletcher's federal constitutional claim but we REVERSE the dismissal of Fletcher's state constitutional claim and we remand this case to the superior court for further litigation of the retroactivity question and a resentencing for Fletcher, should this retroactivity question be decided in Fletcher's favor.

---

[239] *Id.* at 278.

[240] *Rutherford v. State*, 486 P.2d 946, 952-53 (Alaska 1971); *Charles*, 287 P.3d at 788.